UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Williams,

Plaintiff,

v.

Port Authority Trans Hudson Corp.,

Defendant.

24-CV-9536 (DEH)

ORDER

DALE E. HO, United States District Judge:

Attached to this Order are: (1) the transcript of the deposition of Dr. Joseph Galloway (Court Exhibit 1) (2) the jury charge and blank verdict form in this case (Court Exhibit 5); (3) the notes sent by the jury during its deliberations (Court Exhibits 2-3); and (4) the jury's verdict form (Court Exhibit 4), with juror signatures redacted.

SO ORDERED.

Dated: August 24, 2026
New York, New York

DALE E. HO
United States District Judge

# COURT EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
25 civ. 9536 (DEH)(JW)

--------------------------------X

EDUARDO WILLIAMS,

Plaintiff,

-against-

PORT AUTHORITY TRANS HUDSON CORP.,

Defendant.

--------------------------------X

\- - -

TUESDAY, AUGUST 11, 2026

\- - -

Oral sworn Remote Video Conference deposition of JOSEPH GALLOWAY, M.D., taken pursuant to Notice, commencing at 3:08 p.m., before Judith A. Maruca, a New Jersey Certified Court Reporter and Notary Public within and for the State of New Jersey.

\- - - -

U.S. LEGAL SUPPORT
1818 MARKET STREET
SUITE 1400
PHILADELPHIA, PENNSYLVANIA 19103
(877) 479-2484

R E M O T E   A P P E A R A N C E S:

FLYNN & WIETZKE, P.C.
BY: MARC WIETZKE, ESQUIRE
1205 Franklin Avenue
Garden City, New York 11530
516.877.1234
mwietzke@felaattorney.com
Attorneys for the Plaintiff

PORT AUTHORITY TRANS HUDSON CORP.
BY: THOMAS BROPHY, ESQUIRE
4 World Trade Center
150 Greenwich Street, 24th Floor
New York, New York 10007
877.673.1022
Attorneys for the Defendant

ALSO PRESENT:

Travis Jewell, Videographer
U.S. Legal Support

\- - -

# I N D E X

\- - -

WITNESS

JOSEPH GALLOWAY, M.D.

(Witness remotely sworn.)



| EXAMINATION | PAGE |
|---|---|
| BY MR. WIETZKE............. | 7, 91 |
| BY MR. BROPHY.............. | 70, 93 |

INDEX TO EXHIBITS

JOSEPH GALLOWAY, M.D.

EDUARDO WILLIAMS vs. PORT AUTHORITY TRANS HUDSON CORP.

TUESDAY, AUGUST 11, 2026

JUDITH A. MARUCA, CCR

| MARKED | DESCRIPTION | PAGE |
| --- | --- | --- |
| Exhibit PX-13 | Imaging | 57 |
| Exhibit PX-14 | Operative Reports (4) | 58 |

(Exhibits retained by Mr. Wietzke)

- - -

DEPOSITION SUPPORT INDEX

- - -

Direction to Witness Not to Answer

Page Line Page Line Page Line

None

Request for Production of Documents

Page Line Page Line Page Line

None

Stipulations

Page Line Page Line Page Line

None

Question Marked

Page Line Page Line Page Line

None

\- - -

THE VIDEOGRAPHER: All right. One moment. I'll start the recording. Recording in progress. We are now on the video record. Time is now 1908 UTC on August 11, 2026, audio and video recording will continue to take place until all parties agree to go off the record. Please note that microphones are sensitive and may pick up whispering and private conversations.

This is a video recorded deposition of Dr. Joseph Galloway. My name is Travis Jewell. I'm the videographer on behalf of U.S. Legal Support. I am not related to any party in this action, nor am I financially interested in the outcome. At this time the court reporter will enter the statement for remote proceedings into the record and swear in the witness.

THE COURT REPORTER: The attorneys participating in this deposition acknowledge that I am not physically present in the deposition room and that I will be reporting this deposition remotely.

They further acknowledge that in lieu of an oath administered in person, the witness will verbally declare his testimony in this manner under penalty of perjury. The parties and their counsel

consent to this arrangement and waive any objections to this manner of reporting.

Please indicate your agreement by stating your name and agreement on the record.

MR. WIETZKE: Marc Wietzke for plaintiff and I agree.

MR. BROPHY: Thomas Brophy on behalf of the defendant, and I agree.

MR. GALLOWAY: Joseph Galloway. The witness and I agree.

THE COURT REPORTER: Doctor, I'm going to swear you in. Can you please raise your right hand? Do you swear that the testimony you're about to give will be the truth, the whole truth and nothing but the truth so help you God?

THE WITNESS: Yes, I do.

THE COURT REPORTER: I'm going to ask for a brief pause, Doctor between Counsel's question and your answer for transmission purposes. So I do need one person speaking at a time, slowly and clearly. Thank you. I'm ready, Counsel.

MR. WIETZKE: Thank you.

BY MR. WIETZKE:

Q. Doctor, I appreciate you making yourself available this way. Obviously, we've

worked out that the trial starts next week and we need to capture your testimony for purposes of the jury. Before we get into your work with Mr. Williams, I'd like to introduce you a little bit to the jury just by way of your background and pedigree.

First off, where did you go to college?

A. Presbyterian College in South Carolina.

Q. What was your undergraduate degree?

A. Biology.

Q. Did you continue on to medical school?

A. I did. The year after graduation, I matriculated into the University of South Carolina School of Medicine in Columbia, South Carolina.

Q. And how long does that medical school last?

A. Four years.

Q. Following medical school, did you participate in something called a residency?

A. I did.

Q. What is a residency?

A. Residency is postgraduate training which is best akin to an apprenticeship where you're

practicing under the guidance and the apprentice, the license and mentorship, of fully certified physicians and receiving additional specialized training so that you're able to gain experience and see a breadth of things while patients are still receiving safe care under experienced hands.

Q. Where did you do your residency?

A. Rutgers. The New Jersey Medical School in Newark, New Jersey.

Q. Now, after your residency, did you continue your training in any way?

A. I did, yeah. So I -- I actually did a -- my full training, I did a year of general surgery and then I did five years of orthopedic residency, general orthopedic residency, and then I elected to do a additional year of advanced training in orthopedic trauma care at the Carolinas Medical Center in Charlotte, North Carolina.

Q. What is orthopedic trauma care?

A. It's a sub-discipline within orthopedics that's dedicated to the evaluation, management of traumatized patients, people who receive skeletal injuries; evaluation of their injuries, treatment of them and treatment of post-traumatic sequelae.

Q. And then what is actually involved during, meaning what are you physically doing during the fellowship?

A. During the fellowship, I'm evaluating patients in the trauma bay, operating on patients for any number of traumatic injuries. My fellowship focused on musculoskeletal injuries. So six, sometimes seven days a week for the entire year, on call for three -- every third night taking trauma call and immediately evaluating and treating each patient who came through the door.

Q. What kinds of injuries did you train on during your fellowship? Just an example. I understand it's not going to be exhaustive.

A. Everything ranging from simple slip and fall and twisting your ankle to high speed motor vehicle crashes with pelvic injuries, spinal injuries, large fractures, falls from height and significant construction site injuries, crush injuries, everything.

Q. Have you ever heard the term board certified?

A. Yes.

Q. Do you know what that means?

A. Yes.

Q. And are you board certified?
A. I am.
Q. What does it mean to be board certified?
A. It means that a governing body has evaluated my educational certifications, my test outcomes on a knowledge-based test and then evaluated a selection of patients who I took care of and through formal chart review, as well as me having to present my care of those patients, I was cross-examined on them and they've determined that I meet the standard of safe and competent care by that governing body.
Q. Now, do you hold any academic appointments?
A. I do.
Q. In what way?
A. I'm an assistant professor at The Rutgers New Jersey Medical School, Orthopedic residency, involved in teaching medical students. Five years of orthopedic residence as well as a orthopedic trauma fellow.
Q. Have you participated in any peer reviewed publications within your field?
A. I have.

Q. Approximately how many? I don't need an exact.
A. Around ten.
Q. Now, where do you actually practice? Well, withdrawn.
Do you actually practice medicine at this point?
A. I do. Active.
Q. Where do you do that?
A. At the University Hospital in Newark. The New Jersey Trauma Center in Newark, New Jersey.
Q. Well, what kind of a trauma center is that? I've heard different levels.
A. It is a Level one trauma center. It's designation -- it is designated as a Level one trauma center by the American College of Surgeons, by state, and by the Orthopedic Trauma Association.
Q. What does that mean, to be Level one? I don't know how many levels there are.
A. To receive Level one, you have to have a full complement of a set of standards, of what severity of injuries are you able to manage, which runs the full gamut from ICU and nursing staffing availability to surgeon availability within certain timeframes. And Level one requires neurosurgical,

orthopedic trauma, general surgery, in-house ENT craniofacial. So we have the full designated standard as a Level one orthopedic, as a Level one trauma center.

Q. Now, in your practice, meaning you personally, how often do you treat, let's say, high energy or orthopedic injuries of the foot, weekly, daily?

A. Of the foot? Weekly, yeah.

Q. Okay. And do you treat crush injuries on any type of regular basis?

A. Regularly.

Q. How about open fractures?

A. Routinely.

Q. Now, I'm going to turn your attention a little bit to --

MR. WIETZKE: Tom, to the extent it's necessary, neither of us have been before Judge Ho. So at this point, I'd offer Dr. Galloway as an expert in orthopedic surgery.

Do you have any objection?

MR. BROPHY: No objection.

BY MR. WIETZKE:

Q. Okay. At some point, did Eduardo Williams become a patient of yours?

A. Yes, he did.
Q. Okay. And when he did -- did you keep a chart with regard to him as a patient?
A. Yes.
Q. Now, do you have access to that chart while we're here talking today for the jury?
A. I do.
Q. Okay. I want you to know that it's okay to make access to it if you need to refresh your recollection or sort out some particulars to the extent you can avoid just verbatim reading it, that's preferred. But on the other hand, if you need it just to refresh, that's also certainly fine.
Now, when did you first begin to treat Mr. Williams?
A. April 20, 2024.
Q. And how long was he your patient or has he been your patient?
A. He has been my patient since that time until now.
Q. Okay. So in the, let's say two and a half years since he first became your patient, how many times have you or your practice, have you seen him?
A. As an outpatient? I've had 14 visits,

office visits with him.

Q. Okay. And then were there other times you saw him other than as an outpatient?

A. Certainly while he was admitted in the hospital in his initial trauma admission. And there were times when I saw him in the hospital when he was being evaluated for surgery.

Q. Did you also perform surgeries on him?

A. I did.

Q. How many different surgeries?

A. In total, I've done four surgeries on him.

Q. All right. Now, I'm not going to go through every one of your visits, and I'll talk to you generally about the surgeries. Can you just -- I hate to ask you to do this sort of pedantic thing, but can you just identify for us the visit dates that you've got there, if that's possible. If it's going to be too tedious, I don't want to bother the jury.

A. It's not excessively tedious, just mildly tedious. Let me see. Outpatient visits. Okay, so I -- after seeing and treating him on April 20, 2024, I then saw him as an outpatient April 30, 2024. And then again on June 11, 2024, July 2,

2024, August 6, 2024, September 17, 2024, October 8, 2024, November 19, February 25, 2025, April 15, 2025, June 17, 2025, August 12, 2025, February 10, 2026, and August 4, 2026.

Q. And then the dates of the surgeries, we'll go through those again in a little detail, but they're easier to pull. Just so we have all of this in one place.

A. Uh-huh. First surgery was April 20, 2024. Second surgery was May 15, 2024. Third surgery was June 17, 2024. And fourth surgery was September 24, 2024.

Q. I'm sorry. The last was September -- I missed the date.

A. September 24th.

Q. Thank you. All right. Had you ever seen Mr. Williams prior to April 20th, 2024?

A. I had not.

Q. How is it that Mr. Williams came to be to first become a patient of yours, meaning under what circumstances?

A. He was brought in by emergency medical services to the University Hospital trauma bay, where the general surgery trauma team evaluated him and consulted me and my team for our services.

Q. Right. When you first saw Mr. Williams, did you collect some kind of a history from him?

A. Yes.

Q. What was the history you collected?

A. That he was on that day, had severe left foot pain after an injury at work, in which a large rail, working -- a rail struck his foot and his ankle and caused the injury to his left foot. And he -- I conducted the rest of a standard medical history and physical, but he had no other -- no other identifiable injuries, but had this severe injury to his left foot.

Q. And during your examination, what did you find?

A. He had a deformity to his left foot in which the foot was bent to the side in a valgus deformity and a large --

Q. What does valgus deformity mean? And I'll do that periodically, Doc, because you're going to use words that either I don't know or I want to make sure everybody in the room knows, so I'm just going to slow you down every now and then.

A. If we define the midline of the body, then the foot was deviated and bent in an abnormal

way away from the midline of the body.

Q. Okay. Sorry. So you find he had a valgus deformity, and what else?

A. A large wound on the inside of the foot, the midline side of the foot, with exposed tendon and bone and contamination. He --

Q. What does contamination mean?

A. Dirt.

Q. Okay, that'll do it.

A. Or other types of things that don't belong in the body.

Q. Okay. Was that the end of the findings on your examination?

A. No, the -- he had significant swelling of his foot, but he did have good per -- he had perfusion to his foot. His blood flow was intact. Like he -- his toes were not absent of blood flow, and he had -- he could still perceive sensation in his foot.

Q. What did you do next after performing the examination and collecting the history?

A. Our standard treatment is we will do the most efficient, safe mode that we can, clean the wound at evaluation and then reduce the dislocation. So the deformity that was seen was a dislocation

through several of the joints of the foot that are not supposed to move in that manner. And it was put back into place and then further evaluated and then operatively treated that evening.

Q. Okay. Was there any imaging done that evening?

A. Yes.

Q. What kind?

A. Plain projectional radiography. So plain X-rays as both diagnostic and screening. So we X-ray areas above and below, you know, adjacent to the site of injury. And then after the initial stabilization and cleaning, we obtained advanced imaging with a CT scan.

Q. All right. And with the X-rays, were you able to use them in a diagnostic way to find anything other than what you could see visually when you did your examination?

A. Yes.

Q. What did you find?

A. A dislocation of the Lisfranc midfoot complex with multiple joint dislocations and multiple fractures adjacent to those dislocations.

Q. All right. This is going to be one of those where I slow you down to hopefully explain the

anatomy a little bit. So you talked about Lisfranc. Is that L-I-S-F-R-A-N-C?

A. Yes.

Q. Okay. And you've been talking about dislocation, and then you also talked about multiple fractures. Can you -- I guess this would be a good time to talk about the anatomy of the foot.

Do you have a demonstrative there to sort of walk us through what you're talking about when you talk about these things?

A. Can you see this?

Q. Yes. Okay, so here are two lines at the bottom image?

A. No. All at once.

Q. Okay.

A. Basically, each of these show three images. The top one showing a different profile, but all other five showing a similar profile of the bony anatomy of the foot. And each image has some additional information on it superimposed on that bony anatomy. But if we start with, say, this top image in the center, you can see that the foot is complex with multiple areas. The part in the back, which people colloquially call the heel, we refer to medically as the hind foot. The part in the front

with the toes, and these long bones we refer to as the forefoot. And that's what people may refer to as the ball of their foot. The zone in between, aptly, but it's in the middle portion, so it is referred to as the midfoot. And all of these bones, these small bones here called the cuneiform bones and the cuboid, are the place where forces are transmitted from the metatarsals along the axis of the foot to allow for walking. And this area has a precise architecture that allows for force transmission. And it's important that they be tightly bound to one another. And the bones are bound to one another by ligaments, much like ropes holding different things together.

One of those ligaments has historically drawn a lot of attention and was named after a surgeon who initially took care of one of the injuries back in the Napoleonic wars, and that is the Lisfranc ligament. So it's a ligament that holds the second metatarsal tightly adherent to the medial cuneiform. And that architecture is important because it forms the keystone of what arch -- what is very similar to a Roman arch. And so that keystone being in place is required to have tight force transmission. If these metatarsal bones

become separated from the cuneiforms, anytime a joint is separated, we term that a dislocation. And then it is common in high-energy injuries that you can have dislocations, and depending on whether a ligament fails from a force first, or whether a bone fails, that determines whether it will be a dislocation or a fracture, and sometimes we see both occur.

Q. So, for example, with Mr. Williams, I think you said you had both dislocations, and then on X-rays you saw fractures.

A. Yes.

Q. Can you tell which one came first, or does it, does anybody care?

A. Academicians care, because it helps us with research and it can help us a little bit with understanding force vectors. It can help us with treatment, because as a -- the direction that a dislocation occurs, well, our treatment that we apply, we want to resist that force; however, it would be challenging to tell the exact force that occurred. But Mr. Williams had what we term a homolateral midfoot fracture, dislocation -- homo meaning same; lateral to the lateral side. So all of his bones moved in the same direction. It can

occur where you have a log splitting, where the bones separate from one another, but all of his dislocated in the same direction, which means that there was a violent force that pushed his foot off to the side. And he had a dislocation of his first metatarsal, his second metatarsal, his third metatarsal, as well as fractures of his lateral cuneiform and his cuboid.

And in addition to that, what's a little more challenging to depict on this, but that I want to show with this image here, is that there's -- there's not just the injury that occurs to the bones. If there is enough energy that is imparted to this area of the body, that same energy is applying force and tension and leverage to the tissues that live around the bones. So there's tearing of the ligaments that occurs, which this demonstrates. And you can see that this also demonstrates that you may have fractures adjacent to it. But then it's important to recognize that there are muscles and tendons and nerves and blood vessels that are immediately and tightly adherent and adjacent to these bones. The anatomy of the foot is very close quarters and very tight. So whereas injuries in other areas of the body, you might not

see as much injury to other tissues adjacent to the bone in the foot, when the bones fail, the tissues that are very closely approximated to those bones also tend to fail and receive trauma. And so I could also show you that radiographically.

Q. All right. So just generally where, using these diagrams, where did you find injury on the night of the incident in the ER with Mr. Williams?

A. For Mr. Williams, there was a tear in his skin on this side of the foot, which can you see my cursor here? I could also try to use the laser pointer. If you can see my cursor, where I'm gesturing here, this is what people might call the arch of the foot or the inside of the foot. The area, if you had a second foot, it would maybe be represented here. So he had a tear in his skin here. And this bone, the medial cuneiform, was poking out through the skin. This bone, the medial metatarsal, was dislocated away from the midline. The second bone was dislocated away from the midline and completely separated from the intermediate cuneiform and the medial cuneiform, disrupting that Roman -- that so-called Roman arch, disrupting the architecture of the arch of the foot. This third

one was both fractured and was dislocated away from the lateral cuneiform, which was also fractured, and the cuboid, which represents the lateral column of the foot. Its purpose being to allow for supple accommodation of the ground, was a multi-fragmentary fracture. We would call it a comminuted fracture, meaning that there was enough force imparted to it that it failed not in one plane, but failed more like you would see a brick fail if it fell from a height and broke into many pieces. So we call that comminution or multi-fragmentary.

Q. All right. So is that it for the diagram for the moment?

A. I think that more or less demonstrates everything. The only other thing I would like to highlight is as these, you know, as I mentioned, as there's a force here, these soft tissues also take injury. This schematic here demonstrates only the top of the foot, but the bottom of the foot also has a set of muscles and a set of tendons that are running in a similar manner. It's worth noting that the tissues on the bottom of the foot also receive the same energy.

Q. All right. I want to go back to then -- so you perform the examination, you take the

imaging, you identify what you just explained for us. What did you do for him that night?

A. Sure. So the goals -- there are multiple goals in treatment of an open fracture or open fracture dislocation. One of the paramount goals is to reduce the chance of infection. Because the skin has failed and there's an open wound, there's outside contamination that has found its way into the body. There are areas of the body, say the stomach, where outside things come into our body all the time. And our normal body's defenses, it's no issue. When dirt, contamination, bacteria, even the bacteria that live on our skin, get access inside the skin in an area that doesn't have a normal, a robust defense system against that, there is a high rate of infection. So one of the primary goals is reducing that chance of infection, which includes washing and cleaning with careful attention to looking for contamination and removing it. So the first thing that we did, after a formal evaluation and finalizing our diagnoses, we went to the operating room and explored the wound, cleaned out contamination, cleaned the bones as best we could and washed copiously. Then we reduced and realigned the foot, and I could even show you that on X-ray.

Q. Okay. While you're doing that, how do you go about reducing and realigning the foot?

A. Can you see an X-ray right now or a wound image?

Q. That's a wound image.

A. Okay, well, this is -- this is his wound that happened. And this is the bone that's sticking out, that's coming through his open wound. This is the medial cuneiform.

Q. So this is before you've performed any surgeries on it, this is just --

A. This is before surgery. This is before reduction. This is the first image when he came in through the emergency department.

Q. Okay. And what did you proceed to do from there?

A. This was cleaned as well as possible within the confines of the pain limitation, basically just pouring water over it and then reducing it and then continuing advanced imaging. So then we could take him to the operating room and then under general anesthesia, perform a formal cleaning.

Q. So did you have to go through the whole informed consent process with him?

A. Yes.
Q. All right. And what are the hazards that he has to accept in order to go through this process?
A. The hazards are that there's risk of general anesthesia. There is risk of his traumatic wound not healing well, risk -- a high risk of infection given the contamination, but that the purpose of surgery is to reduce that risk. There's risk of the bones not healing to one another properly, owing to the fact of the trauma to the tissue and rupture of the ligaments. There's risk that the implants, the hardware that we use, could break, and there's risk that it could require multiple surgeries.
Q. All right. Why don't you continue walking us through what you did. I mean, obviously, you got up on the screen. Is this an X-ray?
A. This is an X-ray.
Q. Okay.
A. This is the first X-ray.
Q. Tell us what you see in the X-ray.
A. So this is the first X-ray when he came in. And what I see here is, I see dislocation of the first metatarsal from the cuneiform.

Dislocation of the second metatarsal from the intermediate and the medial cuneiform, dislocation of the third metatarsal. Fracture of the intermediate cuneiform and fracture. Highly comminuted fracture of the cuboid. This is a significant amount of deformity. The foot should be -- this bone should be pointing this way.

Q. Got it. And so what was it that you were hoping to do on that first night to get things going in the right direction? So what are we looking at here on the screen? Oh, the first one you had up looked like -- was that the opposite foot?

A. Yes.

Q. Okay.

A. We commonly obtain X-rays of the normal side so that we have a comparison, so that we know how we're trying to match. Because not everybody's anatomy is identical, but there is high symmetry. So there is no meaningful X-rays that would help understand the cleaning part of the procedure.

Q. Right.

A. But that portion was just working through the traumatized tissue, through the opening

in the skin, exploring, removing contamination, and washing. Once we had that, we were able to line the foot back up, and at the time of my evaluation in the operating room, his foot was significantly swollen. And this is common with violent injuries that, over time, the tissue evolves. So there is swelling that's happening in the skin, in the subcutaneous tissue, in the muscle. And that swelling, much like an inflating balloon, stretches the skin. If the skin stretches too much, it becomes unsafe to place incisions on the skin because we won't be able to close it. Furthermore, as the skin stretches and from the impact of the trauma, there's damage to the blood vessels of the skin. And so they're in very traumatized skin. There is potential for poor healing just due to the damage to the blood vessels of the skin. And in his case, he had blisters that were beginning to evolve on his skin. So on that clinical image I showed in the beginning, there were no blisters. But within a few hours, by the time I had him in the operating room, he was already developing blisters of his skin, meaning that it was unsafe for me to place more incisions on his foot.

So what you see here are pins, metal

wires. These are about 2 millimeters in size, and this one's about 5 millimeters in size that were being placed through the skin to hold his bones in alignment, knowing that that would not be sufficient stability to be a permanent solution for him, but it would hold his foot in a safe position while his skin starts to heal.

Q. Okay.

A. So this would never -- this was never intended, nor would it be, a definitive solution.

Q. All right. So how long did the -- and how are those pins held in place?

A. They're just driven into the bone much like a nail is driven into wood, and it's held in place by friction.

Q. Okay.

A. Well, this one is screwed in. Sorry.

Q. All right. And what does that look like from the outside? Is there anything or is it just held in place like you explained? Because obviously he doesn't have that forever. So what happens?

A. No, it doesn't. So these -- these go through very small, safe incisions on the skin, and they're sticking out of the skin. And I try to

counsel my patients as much as I can that an external fixation system like this and percutaneous wires can be alarming because basically it looks like you have an erector set on your foot and can be psychologically disturbing for people to see that. But it is a way of holding the foot in a good, safe alignment while the tissue rests.

Q. Okay. So how did that proceed that night? That's -- this is still that very -- that day that it happened?

A. First night. Yeah.

Q. And then how did the treatment -- like I said, I'm not going to go through every single visit with you because I think I'll lose my jury. But at the same time, walk me through the treatment arc, and let's go with what you did, and then also why.

A. Okay. So the next stage was basically wait, wait and monitor for the tissue to be ready. And he did come back, and we evaluated his tissue at one week and two weeks, I believe, at about a week and a half it was actually, and his tissue was not ready, so we had to wait longer. So if you look, I can show you, his second surgery occurred on May 15th. So that was basically a full three, three and

a half weeks from the time of his injury. That was how long we had to wait for his tissue to be ready and safe to be able to operate, or as safe as I thought it could get.

Q. All right.

A. During that time, I was counseling him about what the treatment would entail. He was very concerned about the -- the risk of losing his foot, which I did tell him if there was a severe infection, there was certainly a non zero chance that he could lose his foot, but it was reasonably something that could be treated surgically with an anticipated salvage of his foot that he would be able to walk on.

Q. Now, what was your -- well, okay, let's talk about the next surgery, because I want to see how you went about what you did next.

A. Well, rather than going through all of the intraoperative X-rays, I'll just show you the final outcome.

Q. Okay.

A. So what this shows is that the first metatarsal is well aligned with the talus, meaning the overall alignment of the foot, is where it needs to be. This demonstrates that this external fixator

I left on the side of the foot to hold out the lateral border of the foot. Because this -- there needs to be an appropriate distance from here to here in order for the foot to function correctly and to not fall into deformity.

These screws are holding the joint reductions after putting the joints back where they go. There's two screws holding the first metatarsal -- tarsometatarsal joint. There's one screw holding the second tarsometatarsal joint, one screw holding two of the cuneiforms together, and one screw basically replacing the Lisfranc ligament holding the second metatarsal to the first cuneiform. Furthermore, you can see here that there's a metatarsal neck fracture, which did not require surgery.

Q. And what are those two things to the left?

A. These are pins that were still sticking out of the skin. These are external fixation Schanz pins. So this cuboid bone was broken in too many pieces to be reconstructable. So when bone fragments get too small to be able to be held together by screws, just because of this simple geometry of the size of a screw and the size of a

fragment, it becomes where holding the pieces in the proper place will not work effectively with internal screws. But by leaving a frame on the outside, I can hold the overall alignment of the foot while it begins to consolidate. So this was not sufficient stability to be able to hold his foot. He required an external fixation for an additional six weeks.

Q. So, I mean, it seems, I guess, obvious to me, but was he able to use that foot, meaning put any weight on it at all?

A. No. After these injuries, you cannot, especially one of this magnitude, he was not -- I did not let him walk on this for over three months.

Q. Okay. And in between the surgeries, is there any treatment that he's undergoing?

A. Yes. So the first phase was monitoring his soft tissue, making sure that his wounds were healing. And then it was based on -- the treatment was physical therapy for regaining his mobility by learning how to use a knee scooter, learning how to use crutches, and learning how to keep his upper body strong enough to maintain some level of independence, and as well as pain control and prevention of other complications. So we're trying to prevent blood clots. So we're keeping him

on an aspirin during this timeline. We're also educating him about joint motion. We're trying to move his ankle, move his knee, take the muscles which can be used and practice using them to keep them at as high of a level of function as is feasible while we're not allowing him to put his weight on his foot.

Q. Now, when you did this, this work with these screws, were there other options available to you that you decided against, or is this the one and only choice you had?

A. No, there's basically, broadly speaking, there's two ways of fixing midfoot injuries. You can put it all back together and hold it as an operative fixation, or you can try to fuse the bones together. The manner in which you attempt to do either of those treatments, the hardware that you use, there are different tactics and there are pros and cons to a lot of them. Some people, in some injuries, you could use a metal plate, which is a larger implant that could go across the bones with screws holding it. There are also some people try to use sutures to hold them together and stitches in a flexible fixation. The more violent the injury, the more dislocation. The larger the dislocation,

the more strength of the repair you're going to want.

So for me, there's two advantages to using screws as opposed -- it's much stronger than a flexible fixation. And given that this was an open injury with risk of infection, using a screws only reconstruction, means that there's a lower risk of wound healing problems and infection down the road. And it also gives me less -- it makes it easier and safer for me to manage the problems if there are wound healing issues.

Q. All right. So we're looking at the surgery from May of 2024. This was the second surgery. You've already told us that you ultimately did four. When these screws were put in, were they intended to be permanent?

A. Most commonly, yes. So midfoot fracture fixations -- I tell all of my patients that there will be an option to remove the screws if they bother you, but if they do not bother you, they don't necessarily have to come out. It's an optionality. It leaves to options down the road.

Q. All right. So walk me through what happens after this surgery and before the next surgery?

A. Sure. So after the May 15th, he was continuing down his physical therapy protocol. And then -- let me see if I can find the exact date -- on his June 11th visit when I was monitoring his recovery and how he was progressing with physical therapy, it was -- that was the timeline when he was doing very well, following all of his precautions, and it was time to take his external fixator off because you can't leave things -- so the screws here are buried underneath his Skin. The Schanz pins of the external fixator are sticking out through his skin. So we don't routinely leave those on for long term. So after a prescribed amount of time, typically, and it's around six or eight weeks for this bone to heal enough that it no longer needs support, I took him back for a planned staged removal of this external fixator.

Q. What does that mean, a planned stage removal?

A. Sorry. I took his external fixator off, and it was done after the prescribed time that I had it on.

Q. Got it.

A. In other words, it didn't loosen up, it didn't fall apart, it didn't need to be removed

because of a problem from it, but it needed to be removed because its useful life and purpose had been served.

Q. Now, in terms of that third surgery, did you -- did you assess the shape of his foot and ankle in terms of its healing?

A. Yeah.

Q. Okay. Have you ever heard the term equinus?

A. Yes.

Q. My understanding is that you had something that regarding his ankle contracting into equinus. What does that mean?

A. So the equinus just means that the foot is pushing downward.

Q. Okay.

A. And the reason that occurs is because the muscles that we have around our ankle, which push our ankle down, are much more powerful than the muscles that lift our foot up. And that makes intuitive sense. Those muscles are used for push off when you're walking. Those are the muscles that are used when you jump, and those are very powerful muscles. And when you are not -- every time you walk normally, your foot, which is trailing, the

foot that you're pushing off with when you're walking, it's actually being stretched. The calf muscles and the Achilles tendon are being stretched every time you're pushing off. And when you're not walking, there is a natural imbalance in those muscles. And so the more powerful muscles on the backside can begin to overcome the weaker muscles on the front side, and the foot begins to droop. And maybe, actually the schematic that I shared earlier has a -- it demonstrates that, that's not the purpose of this schematic, but here, if the leg, the tibia, comes down onto the talus, and this would be almost like a ballerina standing on her toes or on their toes. The muscles on the back side that attach, attached to the heel bone, the calcaneus, are much more powerful than the muscles on the front. And so this deformity can occur in an injury when someone is not walking.

Q. Got it.

A. And if that becomes, if that happens for too long, then it can encumber that person from walking. So when I talked to him about removing his external fixator, I said, hey, I told him that he was developing an equinus contracture. And we had already been working with physical therapy trying to

keep his ankle flexible, but it was happening anyways. He was still getting stiffness, so we decided that while he was asleep, I would stretch his ankle for him. And so I did a manipulation of his ankle to stretch out the tissue while he was asleep.

Q. All right. So when he woke up from the third surgery, I guess that you're saying the external fixation thing is gone at that point, right?

A. Yes.

Q. And were all of the screws out at that point?

A. No.

Q. Okay. So after the third, obviously, then we know there's a fourth, which I think you said took place September 24th of '24. And what was the purpose of the fourth operation?

A. Yeah.

Q. Or what the indication, whatever the reason you decided to go forward with another one?

A. So on September 17, the patient was in my office for follow up. And the area of his -- on the medial side of his wound, the midline side of his wound of his foot, a wound had opened up about

1/2 by 1/2 centimeter where the skin broke down and there was -- it was what we would call a sinus tract. So it's -- it's a wound that's not healing on that side of the foot, and that's an opportunity for infection. It can represent one of two things. It usually -- it is either that the skin on top of it has died from trauma and insufficient blood flow, or that there is infection that's working its way out and preventing the skin from healing there. And so at this point in his care, he was already three months out from his injury. He had had stability from the screws and had been working with physical therapy. There had been ongoing healing in his foot of the tissue that lives between the bones. Ligaments cannot regrow. So he wasn't forming brand new ligaments. He was healing with scar tissue in between the bones.

Q. Was that expected?

A. Yes.

Q. Will the scar tissue -- what did you expect the scar tissue to work and respond in terms of using his foot the way it would if it had been the ligament that was supposed to be there?

A. It will never work exactly the same as the ligaments that were there, but it can heal with

enough robustness with -- to withstand forces of walking and doing activities.

Q. Got it.

A. Meaning that it has reached a point where it provides enough structural integrity to no longer require the support of the screws. And so given that his tissue, his skin, had an open wound with the possibility of infection, I talked to him about options for that. This most straightforward and least risky option being to remove the hardware so that there's no foreign body in his foot that would cause ongoing opportunity for infection.

Q. Got it. Now, did his toes in the foot structure itself straighten out the way it was originally, meaning pre injury?

A. Well, mostly. So the overall architecture of the midfoot I can show. Can you see these?

Q. Yes.

A. So this is after the fourth surgery, after removal of the screws, as well as cleaning of that wound where the skin broke down. And we call it a debridement and cleaning the surface and getting back to healthy tissue to allow it to heal. What you can see here is that the 50,000 foot view

architecture of the foot is preserved. The major measurements that we use -- this is a side view of the foot. The normal architecture should have the first metatarsal -- apologize -- this isn't -- the first metatarsal should line up with the axis of the talus, which it does on both the side view, called the lateral and the ap. And there's a normal range of variation. So these line up within an appropriate amount. However, it would not be accurate to say that all of the arc -- all of the alignment here is perfect as it was prior to the injury. You can see there's still deformity of the second metatarsal. You can see that there's still some widening in this space. You can see that the cuboid still has irregularities. Gapping of the calcanea cuboid joint, narrowing of the fourth metatarsal cuboid joint, and --

Q. All of those items that you just identified, was that, I'll say, an unfortunate but expected outcome given what you were confronting?

A. Yes.

Q. Okay. Is that something that you -- I mean, obviously this is from November of 2024, which is what, a year and a half ago, is that something you expected even back then to go away completely?

A. No.
Q. Why not?
A. Because this is -- so this is what we term post-traumatic sequelae, meaning a constellation. A lot of things which are expected after an injury when we cannot restore something -- we can't undo the injury that occurred. All we can do is restore alignment and reduce the chance of altered mechanics happening. We cannot make it perfect, make it exact, and undo the damage that occurred.
So, for example, the cartilage that lines the joints takes a -- it is traumatized at the time of an injury. I can't undo damage to cartilage. The ligaments that rupture. I can't rebuild ligaments, and the human body can't regrow ligaments. It heals with scar tissue. So the motion that occurs between these joints will never be exactly the same as it was before.
Q. Is there expected symptoms or outcomes as a result of the damaged cartilage or the damaged --
A. Yes.
Q. You used the other word, and I can't remember now. Tendons, I guess?

A. Tendons and ligaments.
Q. Right. What is the expectation despite your best efforts?
A. The most common is stiffness. Stiffness is extremely common, and pain as a result of arthritis is very common. Stiffness related to both joints as well as the tendons and the muscles that live around the joints, having fibrosis and scarring within the muscles.
Q. Well, you mentioned arthritis. I mean, doesn't everybody get arthritis as they get older?
A. No, not everybody does. In fact, the majority of people do not.
Q. Okay.
A. And there are areas of the body which are somewhat privileged to normal. What people might think of as wear and tear arthritis. When people say arthritis, I don't want to make conjectures about what most people think of, but the way I describe normal arthritis to my patients, I describe osteoarthritis, or wear and tear arthritis, which is the simplest analogy, would be much like the tire tread on tire wearing out over its useful life. The two most common joints for that to occur

in are the hip and the knee, which is why hip and knee replacements are extremely common.

Arthritis from normal wear and tear is extremely rare in the midfoot, and the overwhelming majority, the overwhelming causative agent for arthritis in the midfoot is trauma, the others being inflammatory arthritis and, you know, altered, you know, other things.

Q. So if it's not osteoarthritis, what is there another kind of?

A. Yeah, okay, so the other kinds of arthritis are inflammatory arthritis. The most common examples that people may have heard of are rheumatoid arthritis and gout. Those are scenarios where there's a reason that there's inflammation inside the joint. Either autoimmune, the body's attacking itself, or crystals form there and the body responds to those crystals with inflammation. The other reason --

Q. Let me ask a quick question. So if you have that kind, do you see it in both sides of the midfoot, then?

A. Well, inflammatory arthritis is very uncommon in the midfoot. And gout also does not occur in the midfoot. Gout most commonly happens in

the big toe, at the junction of the toe and the metatarsal, not the midfoot and the ankle and the knee.

Q. And what are the other kinds of arthritis then?

A. Degenerative from tendon malfunction. So if in the midfoot -- for example, in the midfoot, the two most common causes of arthritis that are not trauma are a Charcot joint, which is where someone has such a severe damage to their sensibility of their foot, most commonly from diabetes, and they can't feel their foot, and they basically walk around too strongly. They stomp around on their foot, and their forces are too high because they can't feel that they're stomping around.

And the other is tendon dysfunction, where the mechanics of the foot are not normal. Both of those diseases happen on both sides bilaterally.

Q. Got it. Do you -- have you been monitoring Mr. Williams's right foot along the way as well?

A. Yep.

Q. Okay. And have you seen him developing any of these other kinds of arthritis in

his right foot that you've been talking about here?

A. Nope. Here is his right foot.

Q. Okay.

A. Compared with his left foot in June of 2025. Some differences that I'll draw out. There is a crisp, smooth joint line of the first metatarsal. Here you see some irregularity across this joint space.

Q. Now, you got your right and your left flip flopped on this.

A. That is an excellent point. Let me make that simpler. Now left is left and right is right. So here you see smoothness on the right side, irregularity on the left side, smoothness on the Lisfranc joint space; irregularity on the joint space, and importantly, smoothness of the 5th, 4th, and 5th tarsometatarsal joints, and irregularity of the 4th and 5th tarsometatarsal joints. You also can now see that there's some arthritis happening in the great toe, whereas there's none on the right side. And furthermore, in August, see if I can get these right and left, right side, left side. So same thing. Loss of joint space. There is a normal 2 millimeter gap here, 2 millimeter gap here, 2 millimeter gap here. Minimal to no gap left.

Minimal to no gap left. And furthermore, what you can see, you can see deformity of the toe here compared to here. You can see arthritis of the first metatarsophalangeal joint. No arthritis of the first metatarsophalangeal joint. But you can see preservation of the major architecture.

Q. So while you're pulling that up, let me ask you, is that arthritis that you're seeing there something that you expect to dissipate or just go away, ultimately?

A. No. Arthritis is irreversible.

Q. So what we're seeing on these images, is that permanent?

A. Yes.

Q. Do you expect it to improve from this point or get worse or something else?

A. It will be hard for me to say, predict whether it will get worse, but it will not improve.

Q. Okay. This is the best it's going to be?

A. Yes.

Q. Okay. Now, what we're looking at there on the left foot, what are there common symptoms that you expect with what you're?

A. With that kind of imaging stiffness,

pain. With high forces across the foot, the stiffness can make it hard to get your foot into certain positions. And arthritis also causes swelling, and swelling can make it hard to fit your foot into shoes.

Q. Okay, what about the surfaces you're walking on? Does the arthritis affect, for example, walking on smooth surface versus uneven or incline decline versus flat, anything like that?

A. Well, that depends on where the arthritis is because that comes back to the stiffness. So in order to walk on smooth surfaces, there's not a whole lot of complexity that's needed in the foot. To walk on uneven surfaces, the foot needs to do what we call accommodation, where it has a flexible ability to adapt to the surface on which it's walking. So walking on a slanted surface, the most important joint for that is the subtalar joint, which is back here. However, when walking on an uneven surface, the ability to accommodate side to side happens through the midfoot. And also the ability to push off and lever off of the front of the foot requires force transmission across this arch. And so that force transmission is concentrated in the midfoot.

Q. All right, now what did you ultimately accomplish? Oh, I'm sorry, I did have one more question with the imaging we got up here. That left image, it looks like the toes of the first, second and third. Sorry, I guess it would be the first thing, the third toes. Right. The first toe is the big toe. Is that right?

A. Yes.

Q. Okay. It looks like they're going left instead of straight to somewhat. Is that accurate?

A. That is. What's that? Is a interpretation artifact of projectional radiography. So plane X-rays are two dimensional and they're much like interpreting a shadow on the wall.

Q. Okay.

A. The appearance of the toes drifting off to the side is a result of the direction of the X-ray beam. And in fact, if I put up the opposite side, the toes have that same appearance. And that's however, what you can't see on this X-ray. But that brings to mind what you can see on the lateral is you can see deformity of the toes in.

Q. This direction, meaning going up from the ball of the foot instead of flat?

A. Well, it's just easiest to do.
Q. Oh, there we go. Yeah.
A. All right.
Q. No, you got it.
A. Right on right, left on left, normal on right, injured on left. If you look at when the foot. These are weight-bearing films which represent. Shows you what the normal foot does when weights on it and the toes come out straight and you're. You. You use those to accommodate forces. If you look on the injured side, what you see is that two of the toes rise up out of plane with the others and then curve back down. That's what we call a claw toe, and it is a result of that. It is also caused by trauma to the foot.
Q. So I should ask, at this point, based on your examination, your history that you collected, your treatment of Mr. Williams over the course of whatever it's been, two and a half years at this point, do you have an opinion to a reasonable degree of medical certainty as to what the cause was of the injury that you were treating here?
A. The cause of the injury that I'm treating was that his foot was struck by a heavy

object and caused an axial load and an abduction force, dislocating his foot.

Q. Got it. And is this the type of injury you would see if it was, for example, just degenerative?

A. No.

Q. Okay. Now, I should ask just -- if you could take down your screen just for a moment, please. I'm going to -- and this is sort of just housekeeping from where I sit.

First off, did you have an occasion to review imaging from April 20, 2024, April 21, 2024, May 15, 2024, June 17, 2024, August 6, '24, September 17, '24, September 24, '24, and the last I've got is November 19 of '24.

A. Yes.

Q. Right. And did you have occasion to review that as part of your ongoing treatment? And were you satisfied that the imaging was indeed that of Mr. Williams?

A. Yes.

Q. All right.

MR. WIETZKE: So Tom, I would offer Plaintiff's 13 into evidence at this point. Any objection?

MR. BROPHY: Could we just go off the video for a sec?

MR. WIETZKE: Yeah.

THE VIDEOGRAPHER: Going off video record. Time is now 2017 UTC. Recording stopped.

(Off the videotape.)

MR. BROPHY: I just don't have that exhibit. Oh, what is it?

MR. WIETZKE: Yeah, yeah, sorry. That's the imaging. That's P-13. You didn't object to it, so I figured it wasn't an issue. Hang on. I'm going to share the screen just so you can see what I'm talking about. Where am I -- Zoom, move you over here, I think. Yeah, it should be -- it's a folder of all of the imaging, but I'm just going to put it up on my screen so you can see what it is. Just easier for you. There you go. This is -- it's a -- it's a USB, but it's just all the different imaging.

MR. BROPHY: Can you scroll through them real quick?

MR. WIETZKE: I mean, some of the stuff obviously we've already seen, but -- hang on. Get down here.

MR. BROPHY: And this will be on, I

guess a USB you're going to do. So we need --
MR. WIETZKE: Yeah, it's on a flash drive. Yeah.
MR. BROPHY: So we're both -- we're going to have to give them a laptop.
MR. WIETZKE: Well, I think what they said was that they would -- they had one, they could get us a clean one. Remember we were talking about it with the body cam footage.
MR. BROPHY: Do you want me to tell them tomorrow? I'm going in there tomorrow. I'll tell him.
MR. WIETZKE: Oh, that's -- yeah, you may as well. I thought he was already doing it because we knew we wanted the body cam whether -- regardless of the -- my authenticity challenges. But I'm just -- hang on, let me get down here.
MR. BROPHY: It's fine. We can go back.
MR. WIETZKE: Oh, all right. So hang on. I just gotta figure out where to turn off my sharing. There we go. And by the way, when we go back on Tom, I'm also going to ask -- I'm just going to show them PX-14, which is the four operative reports, and do the same sort of dance with those,

just so you know what's coming. So when we go back on, I'll just ask whether you have any objection to the PX-13.

MR. BROPHY: I don't.

MR. WIETZKE: Okay, well -- but I want to do it for the record.

MR. BROPHY: Yeah, Good.

THE VIDEOGRAPHER: All right, you ready to go back on the video?

MR. WIETZKE: Yes, please.

THE VIDEOGRAPHER: All right. Judith, are you still there? You ready?

THE COURT REPORTER: I'm ready.

THE VIDEOGRAPHER: One second. Recording in progress. Back on the video record. Time is now 2020 UTC.

MR. WIETZKE: All right. So, Mr. Brophy, based on our off-the-record-discussion, any objection to PX-13?

MR. BROPHY: No objection.

(Exhibit No. PX-13, was marked for identification.)

BY MR. WIETZKE:

Q. All right. And then I'm also going to offer with Dr. Galloway -- did you prepare an

operative report for each of your four surgeries?

A. I did.

MR. WIETZKE: And Tom, I have collected those four operative reports as PX-14. Any objection to those four operative reports?

MR. BROPHY: No objection.

MR. WIETZKE: All right. So then I'll offer those in evidence as well.

(Exhibit No. P-14, was marked for identification.)

BY MR. WIETZKE:

Q. Now, Doctor, I want to talk a little bit about -- you've explained for us that he was going to physical therapy throughout. Did you have occasion to follow him, meaning, determine whether he was doing the physical therapy that he was supposed to be doing?

A. I did.

Q. And how could you tell that that was happening?

A. Well, in direct communication with him, examining his progress of his flexibility of his foot, examining his progress of ability to control his toes and his foot, and so all of his evidence pointed to that he was maintaining all of

his precautions and attending all of his therapy sessions.

Q. All right. Now, based on your treatment with him, was he ever able to return his foot to his preinjury condition?

A. When you say preinjury condition, do you mean normal positioning of the foot?

Q. That's a fair question. So did you have an understanding as to what kind of work he did prior to becoming injured?

A. Yes.

Q. And what is your understanding?

A. My understanding was that he worked on the rail line and that he was involved in installation and maintenance, removal of the rails, including hauling heavy devices. He tried to explain several of them to me and the levers and how much that he had to pull the rail ties and how much he had to carry back and forth, as well as walking across uneven ground along the rocks that are placed along the rail line for support and the equipment that he has to carry, as well as the protective equipment that he has to wear when doing such.

Q. And did you make assessments throughout the course of your treatment with him as

to whether he was able to return to doing that work?

A. Yes, I did.

Q. And what was your opinion as to his ability to do that work even after the four surgeries?

A. So my assessment for patients when returning to work is both my own professional opinion and my evaluation of their objective evidence and their exam and what they can show me, as well as it's very common for me to use outside opinions and outside metrics. And in Mr. Williams' case, I also did that and sent him for a functional capacity evaluation where an office of physical therapists trained to do such specific work put him through a set of tests and a set of tasks, seeing if he can do those tasks. And those tasks are based not only on his description of his job, but the description of his job from my understanding is from his work provides job description as well as from the department of labor of certain strenuous thresholds of work.

Q. And following your examination and treatment and review and evaluation personally, and then ultimately, did you receive the findings or outcome of the functional capacity exam you're

talking about?

A. I did.

Q. And based on all of that, did you reach an opinion as to whether he could return to his prior job at the railroad?

A. I did not find any evidence that he was able to complete the tasks that were necessary to do his prior level of work. He was consistently able to demonstrate the ability to do tasks that did not meet those requirements.

Q. Got it. So in other words, you're not saying he's an invalid, right?

A. No, I'm not calling him -- I am not saying anything.

Q. That said, did you complete paperwork for his job explaining that you did not feel that he was capable of returning to work in a full duty capacity?

A. I did, yes.

Q. And in doing that, did you at any point find that Mr. Williams was giving anything less than full effort at trying to recover?

A. No, I did not. I do sometimes encounter that and over the length of time that I've known Mr. Williams, my opinion of him is that he's

been very diligent in everything that I've asked of him and he's put forth a significant amount of effort, and I have not picked up on any signals or signs that he was putting forth submaximal effort. And he always seemed to be working as hard as he could to do the things that I asked him to do.

Q. Now, did you perform any measurements between his left foot and his right foot or measurements within the left foot over the course of the years that you've known him in a way that would allow us to know whether he had improved back to what you would, you know, call a full range of motion or in different planes?

A. Yeah, so I don't, in my office, do force measurement, objective force measurements. The objective measurements that I take largely are flexibility, range of motion of different joints and the ability to get the body into a certain position. And I always -- I like to compare against the patient's other side to see if they're returning towards their normal.

Q. Did you find differences from his injured left side to his uninjured right side?

A. Yes, I did.

Q. Can you describe them for us?

A. Sure. So he had a little bit -- he had reduced flexibility in dorsiflexion of his ankle, which is the motion that occurs when you are traversing over your foot, meaning pulling the toes towards the head. That would be dorsiflexion. And that results in -- that position is needed to say kneel or to stoop or do a squat. He also had reduced motion of his toes; specifically his second and third toes are extremely tight and unable to extend to a neutral position. They remain in a flexed position, in a claw toe position.

Q. Okay. And then in terms of stability and walking on uneven surfaces, did the -- well, I guess we talked about that a little bit with arthritis. It's not really worth going back through.

A. Well, I could also say that I also measured my -- I measured his forefoot pronation and supination. That's a little bit more to describe. Am I -- can you see my hand? Is that useful for me to demonstrate that the -- the foot could be thought of like three feet, like three prongs of a stool. My thumb would represent the heel bone, the calcaneus; my index finger would represent the great toe or the ball -- the largest ball of the foot,

where people commonly get calluses on their foot; and my middle finger would represent the lateral border or the -- the fifth toe area. And those three need to be able to balance. And in order to walk on uneven surfaces, the forefoot needs to be able to rotate like this.

Q. Okay.

A. And Mr. Williams' rotation is reduced. He only has about 3 to 4 degrees of rotation of his forefoot, which would make it challenging to walk on uneven surfaces; whereas the foot should be able to easily accommodate uneven surfaces. If he were to try to walk on uneven surfaces, that force would be transmitted into his ankle.

Q. Has he had any impact on or any effect in terms of sensation as a result of the injury?

A. The major issues that he's expressed to me that he's had with sensation are on the top of his foot. He has some hypersensitivity, and wearing shoes that are tightly laced and stable are painful on the top of his foot.

Q. All right. Based on your most recent examination with him, have you determined that he is in fact able to return to work full duty at this point at the railroad in his old job?

A. I'm sorry. Can you repeat the question?

Q. Sure. Do you have, as of your last appointment with him, did you determine that he was able to return to work at his old job at the railroad, full duty?

A. No, not based on any of the objective evidence that he was able to give me and that I received from his functional capacity evaluation.

Q. And have you ever heard of the term maximum medical improvement?

A. Yes, I have.

Q. What is -- I mean -- it's sort of self-explanatory, but if you could just describe in your words what that means?

A. Yeah, it's an attempt to define a finish line after an injury. It's perhaps an imperfect definition, but it's the point at which we think that it's more likely than not that you've reached the point where you're as good as you're going to get. Certainly there are outliers, certainly the body has ability to do things, but it's a -- within a reasonable set of certainty that's about what you have.

Q. Have you ever heard something

called -- we talked a little bit about osteoarthritis -- have you ever heard of something called post-traumatic arthritis?

A. Yes.

Q. What is that?

A. Post-traumatic arthritis. So arthritis as a larger entity could most simply be defined as loss of the smooth gliding layer of cartilage that lives between two bones that adjoin one another. And any cause that causes loss of that cartilage, we would term arthritis. And whatever the proximate cause of that arthritis would be why we define it. So osteoarthritis is where in terra, post-traumatic means that the loss of the gliding layer occurred from a trauma due to the impact that happened. There are living cells in cartilage, and when they're crushed, and the blood supply and the architecture of the cartilage receives an impact, it can die. And that would be what post-traumatic arthritis is.

Q. You talked to us at the very beginning about your choice to move forward with fixation versus fusion. And is that something you have -- you discuss with the patient?

A. I have, yeah.

Q. Does that rule out fusion in the future? Once you go down the fixation route, does that rule out fusion in the future?

A. No, no, it does not. It's -- well, I'll just say no, it does not.

Q. Under what circumstances does fusion come back into the picture once you've already explored fixation as the means of repair?

A. The most common times that I would do fusion are if the joint is so destroyed at the time of evaluation that I'm 100 percent sure that it will never function normally again. Meaning, for example, there are some injuries where I see the cartilage has been completely removed from the bone. It's just gone. Reconstructing the joint is meaningless at that time. So I'll do a fusion. Other times, when I've been drawing these lines showing the major architecture of the foot, if the soft tissue that heals, the scarring that heals, is insufficiently stable to hold the architecture of the foot, and the foot begins to fall into a deformity, that will not only become a problem in the foot, but it will transmit into a problem in the rest of the body, because forces in the ankle, in the hind foot, in the knee, in the hip, will all be

wrong, and you can get arthritis in those. So when there's major architectural deformity occurring, the solution to that is a fusion.

Q. Is that something that can occur with the advancement of post-traumatic arthritis?

A. I suppose in theory, yes. And that's why I like to follow patients and get weight-bearing films over time to detect it early.

Q. Gotcha. All right. As you sit here today, Doctor, do you expect -- have you reached all of the opinions and explanations you've offered us here to a reasonable degree of medical probability?

A. Yes.

Q. Okay. And based on everything you've seen in your approximately two and a half years of treatment with Mr. Williams, do you ever expect him to be able to return to his work at the railroad, his old job?

A. I think it's unlikely that he will be able to do that job without either significant accommodations or a significant amount of pain.

Q. And did you provide actual -- and I don't know if you have it in your chart somewhere -- did you provide him actual restrictions in terms of what you wanted him limiting his activities to?

A. I did. I'm not sure I would explicitly describe them as what I think his limitations are so much as what he has clearly demonstrated with good faith effort, the ability that he can do. And given my clinical judgment that he has been putting forth full good faith effort, if this is what he was able to show the ability to do, then within reasonable medical certainty, I think that that is all he can do.

Q. All right. Do you have access to what it was? Is it in terms of movements, meaning range of motion, or is it in terms of weight limits or activities?

A. Yeah. So what I explicitly said was that he was able to perform lifting of 35 pounds, the level of his waist, and occasionally perhaps lift 70 pounds. That he was able to demonstrate the ability to lift 40 pounds over his head occasionally and lift 20 pounds over his head frequently. And that he would require extra caution and precautions when walking on any uneven surfaces. And if I could pull up one other document -- sorry, there's just a lot of documents here -- that due to his stiffness in his foot and ability to dorsiflex and flexibility in his ankle, that he would best have to use

different positioning and not be able to kneel with his right foot forward, but would have to position with his right foot back, because he would have to use the flexibility of his left foot to do certain tasks, which would certainly limit certain positions that he could get into.

Q. Gotcha.

MR. WIETZKE: All right, Doctor, at this time I have no further questions. I believe Mr. Brophy may have some.

MR. BROPHY: I do. Thank you. Do you need a minute, Doctor? You want to get water or use the restroom, or you're okay?

THE WITNESS: It's okay. Thank you.

BY MR. BROPHY:

Q. Mr. Williams smoked cigarettes, is that right?

A. This is true.

Q. And since he's been your patient, has he continuously been a cigarette smoker?

A. I did counsel him that reduction of smoking could help him. Could improve chances of fracture healing, and he made efforts to reduce his smoking.

Q. But he still smokes, right?

A. To my knowledge.

Q. Okay. In fact, am I mistaken in believing that you told Mr. Williams that smoking can prevent bone healing, especially in his foot; is that fair?

A. It can reduce bone healing, yes. But not especially in the foot.

Q. Okay. But in general, it reduces blood flow to the bones; is that fair?

A. Yes. Smoking does reduce blood flow to the bones.

Q. Okay. And smokers also have more wound complications than non-smokers; is that fair?

A. Yes, that's fair.

Q. Okay. Bones tend not to -- bones -- I gotta phrase this right. I apologize. Bones don't union or let me strike that. I'll withdraw the question.

But bone non unions are significantly higher in the smoking population; is that fair.

A. That's true.

Q. Okay. Right. Healing can be delayed in smokers; is that correct?

A. That is also true.

Q. Okay. Do you know how many packs per

week Mr. Williams smokes? Are you looking at your notes, Doctor?

A. I am.

Q. Thank you.

A. Yes, I am reviewing my notes. I don't recall off the top of my head. In April of 2024, he endorsed one pack of cigarettes per week, approximately.

Q. And I think your latest note, you saw him, I think, last week, you still have him at a pack per week, right?

A. Yes, that is what I have written in my note.

Q. Okay.

A. However, I did not ask him at this last visit about that.

Q. Okay. Now, we went over those. He had CT scans of his left foot; is that correct?

A. Okay.

Q. And one of those CT scans found mild degenerative arthritis at his first MTP joint; is that correct?

A. This is in the report from the radiologist?

Q. The April 20, 2024 CT scan of his left

foot found mild degenerative arthritis at the first MTP joint. Were you aware of that?

A. Which CT scan?

Q. Sure. April 20, 2024 is the one I'm looking at. I can show it to you, Doctor, if you'd like?

A. No, I'm looking at it now.

Q. Okay.

MR. WIETZKE: Tom, are you asking him to look at the imaging or the report?

MR. BROPHY: The report.

THE WITNESS: I see that. That is in the report.

BY MR. BROPHY:

Q. Okay. That degenerative arthritis would have existed prior to this trauma on April 20th of 2024, right?

A. If in fact it is degenerative arthritis, yes.

Q. Okay. And the MTP joint, that's the big toe in his left foot, right?

A. That is the junction of. Yes, it is the great toe. The junction of the great toe with the forefoot.

Q. Got it. Okay. Did Mr. Williams have

flat feet before this incident?

A. I don't know whether he had a flat left foot. And I don't know what you mean by flat feet.

Q. Okay. Pes Planus. Do you know that term?

A. Yes.

Q. What is that?

A. Pes Planus is a deformity of the forefoot in which there is collapse of the lateral Meary's angle.

Q. His X-ray of his right foot showed he had Pes Planus. His August 4, 2026 one. Are you aware of that?

A. If you -- he has a neutral Meary's angle. I can pull his X-ray up. Can see his X-rays here? No, we can't now.

Q. Yes.

A. Which X-rays.

Q. I was asking about his right foot X-ray from August 4th of 2026.

A. His Meary's angle is 3 degrees off of 180 degrees. The accepted normal is within 4 degrees of either direction. I wouldn't define this as Pes Planus.

Q. Okay. So you don't think he has flat feet, right?

A. I do not.

Q. Okay.

A. Not pathologically. What is colloquially called flat foot by the general public. Perhaps he does not have as high of an arch as anyone else. But to a degree that causes pathologic deformity of the foot, he's quite within the normal range.

Q. Do you know if he had any left ankle injuries before April 20th of 2024?

A. Not that he endorsed to me and not that I recall.

Q. Can you go to your August 6th of 2024 treatment note, Doctor, and I'm going to ask you about a bunch of notes after that as well.

A. No worries. Say which note again.

Q. Sure. August 6th of 2024.

MR. WIETZKE: Doctor, we've still got your imaging up on share.

THE WITNESS: Thank you.

BY MR. BROPHY:

Q. You don't have to put it on the screen, Doctor. Just let me know when you're --

A. Okay.
Q. Okay. At this point, the X-rays, I think your interpretation was that he had a healed fracture, stable Lisfranc joint, and no hardware failure; is that right?
A. That's what I have written here.
Q. Okay. He was doing well at that point, according to your note, right?
A. He was proceeding along the expected course.
Q. Okay. Can go to your October 8th of 2024 note, Doctor.
A. Okay.
Q. All right. He was in a CAM boot at that point, right?
A. October 8th and two weeks after his hardware removal? I believe so.
Q. Okay. You wanted him to stay in that CAM boot for four more weeks; is that right?
A. Yes, that's what I have documented.
Q. All right. So that would take us to early November, right?
A. Yes.
Q. If you go to your next note, November 19th. Do you have that?

A. Do I have a note from November?
Q. November 19th of 2024. Yep.
A. Are you saying that I have a note from November 19th of 2024?
Q. Yeah. I can pull it up for you if you'd like?
A. Yep, got it.
Q. Do you have it?
A. I do.
Q. Okay. He's still ambulating with a CAM boot at that point, right?
A. He was still wearing his CAM boot.
Q. Okay. And the plan was weight-bearing as tolerated, advance to full weight-bearing, wean off the CAM boot and the scooter that he was using, right?
A. Yes.
Q. Okay. And at that point you wanted him off the CAM boot and off the scooter to help him heal; is that fair?
A. Define help him heal.
Q. Sure. It gets more blood flowing and more use of the joint so that you can have increased flexibility, increased healing, as opposed to letting the foot have no gravity or nothing on it so

that it dies and withers away; is that fair?
A. Well, it wouldn't die and wither away, but I wanted him to start putting weight on it to strengthen the bones and increase his flexibility. Yes.
Q. All right. Can you go to your January 14, 2025 note, Doctor?
A. Yes.
Q. Okay. Okay. He was still ambulating on a knee scooter at that visit, right?
A. That's what I have. Yes.
Q. Okay. And he was still wearing the CAM boot most of the time, right?
A. Yes, that's what I have documented.
Q. Okay. And he was advised to progress to full weight-bearing; is that right?
A. Yes, that is true.
Q. All right. He said he was going to throw out the CAM boot, get rid of the knee scooter, right?
A. Yes.
Q. Okay. And then an assessment and plan. It says, quote, per overall recovery, his left leg is not functioning as we want it to be, which is slowing down his recovery. We had an extensive

discussion about increasing his daily activities and the importance of functioning without any assistive devices. Do you see that?

A. I'm sorry. I changed notes.

Q. Sure, sure. This is under assessment plan of January 14, 2025.

A. Yes, I have that documented.

Q. Okay. If you go to your next note. February 25, 2025.

A. Okay.

Q. All right. At that time, he did not endorse any significant pain in his foot; is that fair?

A. Well, yes, but he had occasional pain depending on activities that he was doing.

Q. Okay.

A. All right.

Q. He was ambulating full weight-bearing at that point, right?

A. That is what I have documented.

Q. Okay. No CAM boot, no scooter, just walking, full weight-bearing on his foot, Right?

A. That is what I have documented.

Q. Okay. And the X-rays that they showed he had osteopenia of the left foot due to disuse; is

that correct?
A. I apologize. My computer is loading slowly.
Q. That's okay.
A. But that is what I have documented in the note. Yes.
Q. Okay.
A. And that's common.
Q. His wounds had healed at that point, the majority of them, right?
A. The majority, yes.
Q. Okay. You want an aggressive physical therapy program, right?
A. So -- and in regards to his wound healing, he still had an eschar. So in terms of majority, what that means is he had this area, which is the area of his traumatized tissue that was still healing very slowly but was not taking a turn for the worse.
Q. Understood. Again, though, you wanted him to have an aggressive physical therapy program, right?
A. Yes.
Q. You didn't have put any restrictions on him exercising or at therapy at that time, Right?

A. No specific restrictions.

Q. Okay. All right. April 15, 2025. Can you go to that note, Doc?

A. Okay.

Q. All right. He was able to do a two legged heel rise at that visit. Can you tell me what that is?

A. Sure. A two-leg heel rise is the ability to rise, to lift your calcaneus, your heel bone off of the floor and stand on the ball of your feet.

Q. Okay. And he could do --

A. Both at the same time.

Q. -- he did both at the same time. Right. Okay. And he did a single-leg heel rise with reduced gravity. Can you tell me what that is?

A. This is in April?

Q. Yes, sir.

A. When I conduct a single-leg heel rise with reduced gravity, I ask the patient to hold onto the table adjacent to them, a desk, a chair, something stable to be able to control their upper body and lift their heel off the ground.

Q. Okay. And I know, I think you testified before you sent him for a functional

capacity exam; is that right?
A. That's true.
Q. Okay. And that was you -- I think you also testified you relied on that in part to give an opinion about his physical capabilities, for working at his job on the railroad and for, I take it, other jobs with respect to the DOL classifications, I think you said; is that fair?
A. Yes.
Q. Okay. And I know -- and you got that functional capacity exam. You reviewed it, right?
A. I did.
Q. Okay. Can you pull that up, please, for yourself to review.
A. Okay.
Q. How many pages is the one that you have?
A. Including the face sheet? 16.
Q. Okay. You see section one? It says case information. Do you have that in front of you?
A. Yes.
Q. Okay. He endorsed pain at that functional capacity exam, which I think is dated July 2, 2025. He said pain at best, 2 out of 10, at worst, 4 out of 10. You see that?

A. Yes.

Q. Okay. And then can you scroll down? I don't know if it's the last page or the second to last page.

A. See.

Q. Examinee reliability. Do you see that section? It should be C.

A. Page 14.

Q. I believe so, yes, Doctor.

A. Yes.

Q. Okay. And the impression was given that the Examinee, which is Mr. Williams, demonstrated mild submaximum effort in relevant FCE event protocols. Coefficient of variation results are compatible with symptom magnification component to the examinee's complaint and work ability. Work recommendations reflect the examinee's work capacity demonstrated during the FCE. Due to the examinee's submaximum effort, FCE results cannot guarantee to represent the examinee's maximum functional workability. You see that, Doctor?

A. I see that.

Q. Okay. So what they're saying here is that he did not give full effort at certain things in this functional capacity exam; is that correct?

A. What they're saying is that with the created tool and assessment that they have to make an estimation of someone's ability to put forth their effort, that their measurement implies the possibility of him not putting forth full effort. That's not the same and should not be conflated with a guarantee.

Q. No, I understand that, but what they said is that he demonstrated this mild submaximum effort in relevant FCE protocols?

A. That is what it says.

Q. Okay. And what's symptom magnification, Doctor?

A. Well, you would have to ask them what they mean by that.

Q. Okay. It doesn't mean somebody's magnifying their symptoms and that the objective complaints don't match up to it?

A. That's possibly what they mean.

Q. Okay. But I think you testified that he gave excellent effort in everything that you asked him to do; is that correct?

A. Yes.

Q. Okay. And at the end of the day, you're the one who made the decision one way or

another about whether he could return to his job, right?

A. That's true.

Q. Okay. And you never cleared him to return full duty, right?

A. That's true.

Q. In fact, people at PATH asked you several times for your opinion about whether he could work, whether he could work with restrictions or whether he could return to duty, full duty; is that fair?

MR. WIETZKE: Objection. Go ahead.

THE WITNESS: Sorry.

MR. BROPHY: I'll rephrase it.

BY MR. BROPHY:

Q. In fact, weren't you asked by PATH to give your opinion about whether he could work full duty in his position?

A. I can't recall off the top of my head.

Q. Okay. Do you have a letter in your chart from October 8th of 2025? If you don't, I can show it to you.

A. A letter from October 8?

Q. Yes, sir.

A. Can you pull it up?

Q. Sure. I know you're asking me to share my --

A. I have an August 12th and I have a September 10th, 2025.

Q. Now I have to figure out how to share my screen.

MR. BROPHY: Tom, I got a 9-10-25, where he goes through all of the --

Why don't we go off the record for a minute?

MR. WIETZKE: Sure.

THE VIDEOGRAPHER: Going off video record. Time is now 2100 UTC. Recording stopped.

MR. BROPHY: I have an October 8th one. Marc, you said September 10th. You said --

MR. WIETZKE: Yeah, I got a September 10th of '25 where he kind of -- it's the one where he explains the FCE and goes through the details of the restrictions. The doctor's got that one if you want to pull it up?

MR. BROPHY: Can you just pull that up now, Doctor? I want to see if it's the same letter. I just want to make sure we're not --

THE WITNESS: Am I allowed to share the direct EMR? Because I would have to download it

to a PDF if you want me to share it, otherwise --

MR. WIETZKE: For right now, go ahead and do that. We're off. We're not on the recording.

THE WITNESS: It's not showing any other patient stuff. The only thing it's showing is Mr. Williams.

MR. WIETZKE: That's fine. I think Tom's just trying to make sure we're --

MR. BROPHY: I just want to make sure we're on the same page. If we're not -- yeah. Okay. All right. That's fine. Okay. We can go back on.

THE VIDEOGRAPHER: One moment. Recording in progress. Back on the video. Record time is now 2101 UTC.

BY MR. BROPHY:

Q. Okay, Doctor, thank you for clearing that up. You wrote a September 10, 2025, letter to PATH; is that correct?

A. Yes.

Q. Okay. You talked about his functional capacity exam on July 2, 2025, and you wrote that he demonstrated excellent effort in undergoing this evaluation, right?

A. Yes.

Q. Okay. And you found that it's more likely than not that he won't be able to return to the physical requirements of his job in the future; is that right?

MR. WIETZKE: I'll object only because he doesn't use that language. He -- instead he goes at from a more substantive standpoint, explaining what he can do and not what he can't do.

THE WITNESS: Yes. So I don't see that written anywhere in my note.

BY MR. BROPHY:

Q. Okay. I'm going to try to share with you the October 8th note then.

A. Okay.

Q. You see that, Doctor? I'm showing you an October 8, 2025 note, Bates stamped PA2653. Do you need me to make it bigger?

A. No, I can see it.

Q. Okay. Does this refresh your recollection that you wrote a note to PATH saying that -- based on these objective findings, meaning the FCE as well as my medical assessment, the patient is not capable of performing the duties as provided to me of his job description as a trackman

wanted, and is more likely than not that he will not be able to return to these physical requirements in the future.

A. Yes, I see that.

Q. Okay. And you wrote this note and you gave that opinion; is that fair?

A. I must have.

Q. This is what you have documented. Okay. All right. Okay.

Can you go to your most recent note, August 4, 2026, Doctor? Yes. Okay. I think you noted that most of his pain from the initial timeline is gone, right?

A. I'm not sure I would describe it as that.

Q. Well, if you look at the second page of this note next to the date 8-4-2026, it says, quote, most of the pain from initial timeline is gone. Do you see that?

A. I'm sorry. Mine's not broken down into pages.

Q. I'm sorry. So it's under interval history 8-4-2026.

A. Yes, I see that.

Q. Okay. So it says most of the pain

from his initial timeline is gone, right?
A. Yes.
Q. Okay. And he reported to you at that visit that he can walk a mile most days, right?
A. That's correct.
Q. Okay. And you wanted him to follow up. PRN. What does PRN mean?
A. That means as needed.
Q. Okay. So you have nothing scheduled with him in the future as you sit here today, right?
A. I do not.
Q. Okay. And this note, I think, notes that he recovered very well; is that fair?
A. I would say so, given the severity of his injury.
Q. I know counsel asked you about a foot fusion, but based on his current complaints and your treatment of him at this time, he's not indicated to have a foot fusion; is that fair?
A. I've talked to him about the options of it and talked to him about which symptoms I think that it might improve and which that it would not improve. And based on my conversation with him, he does not think that it would be or we did not come to the conclusion that it would be beneficial in the

risk benefit analysis.

Q. Okay. So as of now, he's not going to have that surgery, right?

A. We do not have that planned.

Q. I think you said -- so you have no plans to see him in the future unless he calls you, right? I think your note says at this point he has my number, right?

A. Yeah. I've given him explicit things that if he wants to pursue that, he will call me.

Q. Okay. But right now, no scheduled appointments, right?

A. No.

MR. BROPHY: Okay. I have nothing further. Thank you, Doctor.

MR. WIETZKE: Thank you, Doctor. I'll be pretty quick.

BY MR. WIETZKE:

Q. So you were asked a whole bunch of questions at the top of the cross examination about the fact that he smokes a pack a day, or at least he did in April 2024. I think you said that it carried through to your most recent note, but you hadn't actually confirmed with him whether that was accurate or not nowadays, meaning two and a half

years later; is that correct?
A. That's correct.
Q. Okay. Regardless of what he might have been smoking in April 2024, meaning before he got hurt, the bone fused as you would expect with anybody, whether a smoker or non-smoker, given the severity of the injury, correct?
A. Can you repeat that?
Q. Sure. The bone here, meaning the healing, followed the natural progression that you would expect of someone, given the severity of the injury here, regardless of whether he was a smoker or not, correct?
A. I would say most likely, yes. For example, his cuboid bone has completely united and on multiple weight-bearing radiographs over time looking for progressive deformity, he has had no change in his architecture and no deformity, meaning that the scar tissue that he formed has enough structural rigidity to withstand the forces of what he's doing.
Q. But structural rigidity is not the same as full range of motion, fair?
A. Definitely not.
Q. Definitely not fair or definitely not

the same?

A. They are definitely not the same thing.

Q. Okay. And in fact, you noted in your letter also from October of '25, that Mr. Williams gave excellent effort. Is that still a fair statement from your assessment of him over the last two and a half years?

A. He's given me no indication that he was doing anything other than giving me good effort.

MR. WIETZKE: I have no further questions. Thank you.

BY MR. BROPHY:

Q. Doctor, real quick. I know you said his bones fused and healed and all that stuff, but it's fair to say smoking causes a longer recovery time; is that fair?

A. It is challenging. And people have spent a lot of time in research articles trying to draw out specific things that cause problems. What we know is that smoking is a risk factor for delayed healing of tissue and bones. Attributing any one particular thing, is challenging.

MR. BROPHY: Understood. Thank you, Doctor.

No further questions. Thank you.

THE VIDEOGRAPHER: Going off the video record. Time is now 2110 UTC.

(Whereupon, the Witness was excused.)

(Whereupon, the deposition concluded at approximately 5:10 p.m.)

C E R T I F I C A T E

I, JUDITH A. MARUCA, a Notary Public and Certified Court Reporter of the State of New Jersey, do hereby certify that prior to the commencement of the examination, JOSEPH GALLOWAY, M.D. was duly sworn by me to testify to the truth, the whole truth and nothing but the truth.

I DO FURTHER CERTIFY that the foregoing is a verbatim transcript of the testimony as taken stenographically by and before me at the time, place and on the date hereinbefore set forth, to the best of my ability.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in the action.

Judith A. Maruca, CCR

JUDITH A. MARUCA, CCR

CCR License Number: 30XI00187300

Dated: August 13, 2026

LAWYER'S NOTES

PAGE LINE

**1**

**1/2** 42:1
**10** 16:3 82:24, 25 87:19
**100** 67:11
**10th** 86:4,15,17
**11** 6:5 15:25
**11th** 38:4
**12** 16:3
**12th** 86:3
**13** 54:24
**14** 14:25 78:7 79:6 83:8
**15** 16:2,10 54:13 81:2
**15th** 32:25 38:1
**16** 82:18
**17** 16:1,3,11 41:22 54:13, 14
**180** 74:23
**19** 16:2 54:15
**1908** 6:5
**19th** 76:25 77:2,4

**2**

**2** 15:25 31:1 49:24 82:24 87:23
**20** 14:16 15:24 16:9 54:12 69:19 72:25 73:4
**2017** 55:5
**2020** 57:16
**2024** 14:16 15:24, 25 16:1,2, 10,11,12,17 37:13 44:23 54:12,13 72:6,25 73:4,17 75:12,15,19 76:12 77:2,4 91:22 92:4
**2025** 16:2,3 49:5 78:7 79:6,9 81:2 82:24 85:21 86:4 87:19,23 88:17
**2026** 6:5 16:4 74:13,21 89:11
**20th** 16:17 73:17 75:12
**21** 54:12
**2100** 86:13
**2101** 87:16
**2110** 94:3
**24** 16:12 41:17 54:13,14,15
**24th** 16:15 41:17
**25** 16:2 79:9 86:17 93:5

**3**

**3** 64:9 74:22
**30** 15:24
**35** 69:15

**4**

**4** 16:4 64:9 74:13,23 82:25 89:11
**40** 69:18
**4th** 49:16,18 74:21

**5**

**5** 31:2
**50,000** 43:25
**5:10** 94:6
**5th** 49:16,17,18

**6**

**6** 16:1 54:13
**6th** 75:15,19

**7**

**70** 69:17

**8**

**8** 16:1 85:23 88:17
**8-4-2026** 89:17,23
**8th** 76:11,16 85:21 86:14 88:14

**9**

**9-10-25** 86:7

**A**

**abduction** 54:1
**ability** 51:16,20,22 58:23 60:4 61:9 62:18 65:22 69:4, 7,18,24 81:9 83:16 84:3
**able** 9:4 12:22 19:16 30:2, 12 33:3,14 34:23 35:6,9

59:4 60:1 61:7,9 64:4, 6,11,24 65:5,8 68:17,20 69:7,15,17 70:1 81:5,22 88:3 89:2

**abnormal** 17:25

**above** 19:11

**absent** 18:17

**academic** 11:14

**Academicians** 22:15

**accept** 28:3

**accepted** 74:23

**access** 14:5,9 26:13 69:10

**accommodate** 51:20 53:10 64:12

**accommodation** 25:5 51:15

**accommodations** 68:21

**accomplish** 52:2

**accurate** 44:10 52:11 91:25

**Achilles** 40:3

**acknowledge** 6:19,22

**across** 36:21 49:7 51:1,23 59:20

**action** 6:13

**Active** 12:8

**activities** 43:2 68:25 69:13 79:1, 15

**actual** 68:22,24

**adapt** 51:16

**addition** 23:9

**additional** 9:3,16 20:20 35:7

**adherent** 21:20 23:22

**adjacent** 19:11,23 23:19,23 24:1 81:21

**adjoin** 66:9

**administered** 6:23

**admission** 15:5

**admitted** 15:4

**advance** 77:14

**advanced** 9:16 19:13 27:20

**advancement** 68:5

**advantages** 37:3

**advised** 78:15

**affect** 51:7

**agent** 47:5

**aggressive** 80:12,21

**ago** 44:24

**agree** 6:7 7:6,8,10

**agreement** 7:3,4

**ahead** 85:12 87:2

**akin** 8:25

**alarming** 32:3

**aligned** 33:23

**alignment** 31:4 32:7 33:24 35:4 44:11 45:8

**allow** 21:9 25:4 43:24 62:11

**allowed** 86:24

**allowing** 36:6

**allows** 21:10

**altered** 45:9 47:7

**ambulating** 77:10 78:9 79:18

**American** 12:16

**amount** 29:6 38:13 44:9 62:2 68:21

**analogy** 46:23

**analysis** 91:1

**anatomy** 20:1,7,19,21 23:23 29:19

**anesthesia** 27:22 28:6

**angle** 74:11,16,22

**ankle** 10:16 17:9 36:3 39:6, 12,18,19 41:1,4,5 48:2 63:2 64:14 67:24 69:25 75:11

**answer** 7:19

**anticipated** 33:13

**anybody** 22:14 92:6

**anyone** 75:8

**anytime** 22:1

**ap** 44:7

**apart** 38:25

**apologize** 44:4 71:16 80:2

**appearance** 52:17,20

**apply** 22:20

**applying** 23:15

**appointment** 65:4

**appointments** 11:15 91:12

**appreciate** 7:24

**apprentice** 9:1

**apprenticeship** 8:25

**appropriate** 34:3 44:9
**approximated** 24:3
**approximately** 12:1 68:15 72:8 94:6
**April** 14:16 15:23, 24 16:2,9,17 54:12 72:6, 25 73:4,16 75:12 81:2, 17 91:22 92:4
**aptly** 21:4
**arc** 32:16 44:10
**arch** 21:22,23 24:15,24,25 51:24 75:7
**architectural** 68:2
**architecture** 21:10,21 24:25 43:17 44:1,3 50:6 66:18 67:18, 20 92:18
**area** 21:9 23:14 24:16 26:14 41:23 64:3 80:16,17
**areas** 19:11 20:23 23:25 26:9 46:16
**around** 12:3 23:16 38:14 39:18 46:8 48:13, 15
**arrangement** 7:1
**arthritis** 46:6,10,11, 18,19,21,22 47:3,6,7,12, 14,23 48:5, 8,25 49:19 50:3,4,8,11 51:3,7,11 63:15 66:3, 6,7,11,12,20 68:1,5 72:21 73:1,15,19
**articles** 93:19
**artifact** 52:13
**asked** 62:1,6 84:22 85:7,16 90:16 91:19
**asking** 73:9 74:20 86:1
**asleep** 41:3,6
**aspirin** 36:1
**assess** 39:5
**assessment** 60:6 78:22 79:5 84:2 88:23 93:7
**assessments** 59:24
**assistant** 11:18
**assistive** 79:2
**Association** 12:17
**attach** 40:15
**attached** 40:15
**attacking** 47:17
**attempt** 36:16 65:16
**attending** 59:1
**attention** 13:15 21:16 26:18
**attorneys** 6:18
**Attributing** 93:22
**audio** 6:5
**August** 6:5 16:1,3,4 49:21 54:13 74:13,21 75:15,19 86:3 89:11
**authenticity** 56:16
**autoimmune** 47:16
**availability** 12:24
**available** 7:25 36:9
**avoid** 14:11
**aware** 73:2 74:14
**axial** 54:1
**axis** 21:8 44:5

**B**

**back** 19:3 20:23 21:18 25:24 30:3 32:20 34:7 36:14 38:16 40:14 43:24 44:25 51:11,19 53:13 56:19, 23 57:1,9,15 59:19 62:11 63:15 67:7 70:3 87:13, 15
**background** 8:5
**backside** 40:7
**bacteria** 26:12,13
**balance** 64:4
**ball** 21:3 52:25 63:25 81:10
**ballerina** 40:13
**balloon** 30:9
**based** 35:18 53:16 57:18 59:3 60:16 61:3 64:22 65:7 68:14 88:22 90:17,23
**basically** 20:16 27:19 32:3,18,25 34:12 36:12 48:12
**basis** 13:11
**Bates** 88:17
**bay** 10:5 16:23
**beam** 52:19
**begin** 14:14 40:7
**beginning** 30:18,20 66:21
**begins** 35:5 40:8

67:21
**behalf**
6:12 7:7
**believe**
32:21 70:9
76:17 83:9
**believing**
71:3
**belong**
18:11
**below**
19:11
**beneficial**
90:25
**benefit**
91:1
**bent**
17:17,25
**best**
8:25 26:23
46:3 50:19
69:25 82:24
**big**
48:1 52:7
73:21
**bigger**
88:18
**bilaterally**
48:19
**Biology**
8:12
**bit**
8:4 13:16
20:1 22:16
58:13 63:1,
14,19 66:1
**blisters**
30:18,20,22
**blood**
18:16,17
23:21 30:14,
17 35:25
42:7 66:17
71:8,10
77:22
**board**
10:21 11:1,3
**body**
11:5,13
17:24 18:1,
11 23:14,25
26:9,10
35:22 43:11
45:16 46:16
47:18 56:9,
15 62:18
65:22 67:24
81:23
**body's**
26:11 47:16
**bone**
18:6 22:5
24:2,18,19,
21 27:7 29:7
31:13 34:21,
23 38:15
40:15 63:23
67:14 71:4,
6,19 81:10
92:5,9,15
**bones**
21:1,5,6,12,
25 22:25
23:2,13,16,
23 24:2,3
26:23 28:10
31:3 36:16,
21 42:14,17
66:9 71:9,
11,15,16
78:4 93:15,
22
**bony**
20:19,21
**boot**
76:14,19
77:11,12,15,
19 78:13,19
79:21
**border**
34:2 64:3
**bother**
15:19 37:20
**bottom**
20:13 25:19,
22
**bound**
21:12,13
**brand**
42:15
**breadth**
9:5
**break**
28:14
**brick**
25:9
**brief**
7:18
**brings**
52:22
**broadly**
36:12
**broke**
25:10 42:1
43:22
**broken**
34:22 89:20
**Brophy**
7:7 13:22
55:1,7,20,25
56:4,10,18
57:4,7,18,20
58:6 70:10,
11,15 73:11,
14 75:23
85:14,15
86:7,14,21
87:10,17
88:12 91:14
93:13,24
**brought**
16:22
**bunch**
75:17 91:19
**buried**
38:10

**C**

**calcanea**
44:16
**calcaneus**
40:15 63:24
81:9
**calf**
40:2
**call**
10:9,10
20:24 24:14
25:6,10 42:2
43:22 51:15
53:14 62:12
91:10
**called**
8:21 21:6
44:6 66:1,3
75:6
**calling**
61:13
**calls**
91:6
**calluses**
64:1
**cam**
56:9,15
76:14,19
77:11,12,15,
19 78:13,19
79:21
**capabilities**
82:5
**capable**
61:17 88:24
**capacity**
60:13,25
61:18 65:9
82:1,11,23
83:17,25
87:23
**capture**
8:2
**care**
9:6,17,19
11:8,10,12
21:17 22:14,
15 42:10
**careful**
26:18

**Carolina** 8:10,15,16 9:18
**Carolinas** 9:17
**carried** 91:22
**carry** 59:19,22
**cartilage** 45:12,15,21 66:9,11,16, 18 67:14
**case** 30:18 60:12 82:20
**causative** 47:5
**caused** 17:9 53:15 54:1
**caution** 69:20
**cells** 66:16
**center** 9:18 12:11, 12,14,16 13:4 20:22
**centimeter** 42:1
**certain** 12:24 51:3 60:20 62:18 70:4,5 83:24
**certainly** 14:13 15:4 33:10 65:21, 22 70:5
**certainty** 53:21 65:23 69:8
**certifications** 11:6
**certified** 9:2 10:22 11:1,4
**chair** 81:21
**challenges** 56:16
**challenging** 22:21 23:10 64:10 93:18, 23
**chance** 26:6,17 33:10 45:8
**chances** 70:22
**change** 92:18
**changed** 79:4
**Charcot** 48:9
**Charlotte** 9:18
**chart** 11:9 14:3,5 68:23 85:21
**choice** 36:11 66:22
**cigarette** 70:20
**cigarettes** 70:16 72:7
**circumstances** 16:21 67:6
**classifications** 82:7
**claw** 53:14 63:11
**clean** 18:23 56:8
**cleaned** 26:22,23 27:17
**cleaning** 19:13 26:18 27:23 29:21 43:21,23
**cleared** 85:4
**clearing** 87:18
**clearly** 7:21 69:3
**clinical** 30:19 69:5
**close** 23:24 30:12
**closely** 24:3
**clots** 35:25
**Coefficient** 83:14
**collapse** 74:10
**collect** 17:2
**collected** 17:5 53:18 58:3
**collecting** 18:21
**college** 8:8,9 12:16
**colloquially** 20:24 75:6
**Columbia** 8:16
**column** 25:3
**come** 26:10 32:20 37:21 53:9 67:7 90:24
**comes** 40:12 51:11
**comminuted** 25:6 29:5
**comminution** 25:11
**common** 22:3 30:5 46:4,5,6,25 47:2,13 48:8 50:23 60:10 67:9 80:8
**commonly** 29:16 37:17 47:25 48:11 64:1
**communication** 58:21
**compare** 62:19
**compared** 49:4 50:3
**comparison** 29:17
**compatible** 83:15
**competent** 11:12
**complaint** 83:16
**complaints** 84:18 90:17
**complement** 12:21
**complete** 61:7,15
**completely** 24:22 44:25 67:14 92:15
**complex** 19:22 20:23
**complexity** 51:13
**complications** 35:24 71:13
**component** 83:15
**computer** 80:2
**concentrated** 51:25
**concerned** 33:8
**concluded** 94:5
**conclusion**

90:25
**condition** 59:5,6
**conduct** 81:19
**conducted** 17:10
**confines** 27:18
**confirmed** 91:24
**conflated** 84:6
**confronting** 44:20
**conjectures** 46:20
**cons** 36:19
**consent** 7:1 27:25
**consistently** 61:8
**consolidate** 35:5
**constellation** 45:5
**construction** 10:19
**consulted** 16:25
**contamination** 18:6,7 26:8, 12,19,23 28:8 30:1
**continue** 6:6 8:13 9:11 28:16
**continuing** 27:20 38:2
**continuously** 70:20
**contracting** 39:12
**contracture** 40:24
**control** 35:23 58:24 81:22
**conversation** 90:23
**conversations** 6:9
**copiously** 26:24
**correct** 71:23 72:18, 22 80:1 83:25 84:22 87:20 90:5 92:1,2,7,13
**correctly** 34:4
**counsel** 6:25 7:21 32:1 70:21 90:16
**Counsel's** 7:18
**counseling** 33:6
**course** 53:19 59:25 62:9 76:10
**court** 6:15,18 7:11,17 57:13
**craniofacial** 13:2
**crashes** 10:17
**created** 84:2
**crisp** 49:6
**cross** 91:20
**cross-examined** 11:11
**crush** 10:19 13:10
**crushed** 66:17
**crutches** 35:21
**crystals** 47:17,18
**CT** 19:14 72:18, 20,25 73:3
**cuboid** 21:7 23:8 25:3 29:5 34:21 44:15, 16,17 92:15
**cuneiform** 21:6,21 23:8 24:18,23 25:2 27:9 28:25 29:2,4 34:13
**cuneiforms** 22:1 34:11
**current** 90:17
**cursor** 24:12,13
**curve** 53:13

**D**

**daily** 13:8 79:1
**damage** 30:14,17 45:10,14 48:10
**damaged** 45:21
**dance** 56:25
**date** 16:14 38:3 89:17
**dated** 82:23
**dates** 15:17 16:5
**day** 17:6 32:10 84:24 91:21
**days** 10:8 90:4
**debridement** 43:23
**decided** 36:10 41:3, 21
**decision** 84:25
**declare** 6:24
**decline** 51:9
**dedicated** 9:21
**defendant** 7:8
**defense** 26:15
**defenses** 26:11
**define** 17:24 65:16 66:13 74:24 77:21
**defined** 66:8
**definitely** 92:24,25 93:2
**definition** 65:18
**definitive** 31:10
**deformity** 17:16,18,19 18:3,25 29:6 34:5 40:17 44:12 50:2 52:23 67:22 68:2 74:9 75:9 92:17,

18
**degenerative** 48:6 54:5 72:21 73:1, 15,18
**degree** 8:11 53:21 68:12 75:8
**degrees** 64:9 74:22, 23,24
**delayed** 71:22 93:21
**demonstrate** 61:9 63:21 69:17
**demonstrated** 69:4 83:13, 18 84:9 87:24
**demonstrates** 23:18,19 25:14,18 33:25 40:10
**demonstrative** 20:8
**department** 27:14 60:20
**depending** 22:4 79:15
**depends** 51:10
**depict** 23:10
**deposition** 6:10,19,20, 21 94:5
**describe** 46:21,22 62:25 63:19 65:14 69:2 89:14
**description** 60:17,18,19 88:25
**designated** 12:15 13:2
**designation** 12:15
**desk** 81:21
**destroyed** 67:10
**detail** 16:6
**details** 86:18
**detect** 68:8
**determine** 58:15 65:4
**determined** 11:11 64:23
**determines** 22:6
**developing** 30:22 40:24 48:25
**deviated** 17:25
**devices** 59:16 79:3
**diabetes** 48:11
**diagnoses** 26:21
**diagnostic** 19:10,16
**diagram** 25:13
**diagrams** 24:7
**die** 66:19 78:2
**died** 42:7
**dies** 78:1
**differences** 49:5 62:22
**different** 12:13 15:10 20:17 21:14 36:18 55:18 62:13,17 70:1
**diligent** 62:1
**dimensional** 52:14
**direct** 58:21 86:25
**direction** 22:18,25 23:3 29:10 52:18,24 74:24
**dirt** 18:8 26:12
**discuss** 66:24
**discussion** 79:1
**diseases** 48:18
**dislocated** 23:3 24:20, 21 25:1
**dislocating** 54:2
**dislocation** 18:24,25 19:21 20:5 22:2,7,19,23 23:5 26:5 28:24 29:1,2 36:25
**dislocations** 19:22,23 22:4,10
**disrupting** 24:23,24
**dissipate** 50:9
**distance** 34:3
**disturbing** 32:5
**disuse** 79:25
**Doc** 17:20 81:3
**Doctor** 7:11,18,24 58:12 68:10 70:8,12 72:2 73:5 75:16, 20,25 76:12 78:7 83:9,21 84:13 86:22 87:18 88:16 89:11 91:15, 16 93:14,25
**doctor's** 86:19
**document** 69:22
**documented** 76:20 78:14 79:7,20,23 80:5 89:8
**documents** 69:23
**doing** 10:2 27:1 38:7 43:2 56:14 58:16, 17 59:23 60:1 61:20 76:7 79:15 92:21 93:10
**DOL** 82:7
**door** 10:11
**dorsiflex** 69:24
**dorsiflexion** 63:2,5
**download** 86:25
**downward** 39:15
**draw** 49:5 93:20
**drawing** 67:17

**drawn** 21:16
**drifting** 52:17
**drive** 56:3
**driven** 31:13,14
**droop** 40:8
**due** 30:16 66:15 69:23 79:25 83:18
**duties** 88:24
**duty** 61:17 64:24 65:6 85:5, 10,18
**dysfunction** 48:16

**E**

**earlier** 40:9
**early** 68:8 76:22
**easier** 16:7 37:9 55:17
**easiest** 53:1
**easily** 64:12
**Eduardo** 13:24
**educating** 36:2
**educational** 11:6
**effect** 64:15
**effectively** 35:2
**efficient** 18:23
**effort** 61:22 62:3,4 69:4,6 83:13,19,24 84:4,5,10,21 87:24 93:6, 10
**efforts** 46:3 70:23
**eight** 38:14
**either** 17:21 36:17 42:6 47:16 68:20 74:24
**elected** 9:16
**emergency** 16:22 27:14
**EMR** 86:25
**encounter** 61:24
**encumber** 40:21
**end** 18:12 84:24
**endorse** 79:12
**endorsed** 72:7 75:13 82:22
**energy** 13:7 23:13, 14 25:23
**ENT** 13:1
**entail** 33:7
**enter** 6:15
**entire** 10:8
**entity** 66:7
**equinus** 39:9,13,14 40:24
**equipment** 59:21,23
**ER** 24:8
**erector** 32:4
**eschar** 80:15
**estimation** 84:3
**evaluated** 11:6,8 15:7 16:24 19:3 32:20
**evaluating** 10:4,10
**evaluation** 9:21,23 18:24 26:20 30:3 60:8, 13,23 65:9 67:11 87:25
**evening** 19:4,6
**event** 83:14
**everybody** 17:22 46:11, 13
**everybody's** 29:19
**evidence** 54:24 58:8, 25 60:9 61:6 65:8
**evolve** 30:18
**evolves** 30:6
**exact** 12:2 22:21 38:3 45:10
**exactly** 42:24 45:19
**exam** 60:9,25 82:1,11,23 83:25 87:23
**examination** 17:14 18:13, 21 19:18 25:25 53:17 60:22 64:23 91:20
**Examinee** 83:6,12
**examinee's** 83:16,17,18, 20
**examining** 58:22,23
**examples** 47:13
**excellent** 49:11 84:21 87:24 93:6
**excessively** 15:21
**excused** 94:4
**exercising** 80:25
**exhaustive** 10:14
**exhibit** 55:8 57:21 58:9
**existed** 73:16
**expect** 42:21 50:9, 15,24 68:10, 16 92:5,11
**expectation** 46:2
**expected** 42:18 44:20, 25 45:5,20 76:9
**experience** 9:4

**experienced**
9:6
**expert**
13:20
**explain**
19:25 59:17
**explained**
26:1 31:20 58:13
**explaining**
61:16 88:8
**explains**
86:18
**explanations**
68:11
**explicit**
91:9
**explicitly**
69:2,14
**explored**
26:22 67:8
**exploring**
30:1
**exposed**
18:5
**expressed**
64:17
**extend**
63:10
**extensive**
78:25
**extent**
13:17 14:11
**external**
32:2 33:25 34:20 35:7 38:8,11,17, 20 40:23 41:9
**extra**
69:20
**extremely**
46:5 47:2,4 63:9

**F**

**face**
82:18
**fact**
28:11 46:13 52:19 64:24 71:2 73:18 85:7,16 91:21 93:4
**factor**
93:21
**fail**
24:2,4 25:9
**failed**
25:8 26:7
**fails**
22:5,6
**failure**
76:5
**fair**
59:8 71:5,9, 13,14,20 77:20 78:1 79:13 82:8 85:11 89:6 90:13,19 92:23,25 93:6,16,17
**faith**
69:4,6
**fall**
10:16 34:5 38:25 67:21
**falls**
10:18
**FCE**
83:13,18,19 84:10 86:18 88:23
**feasible**
36:6
**February**
16:2,3 79:9
**feel**
48:12,15 61:16
**feet**
63:22 74:1,4 75:2 81:11
**fell**
25:9
**fellow**
11:22
**fellowship**
10:3,4,6,13
**fibrosis**
46:8
**field**
11:24
**fifth**
64:3
**figure**
56:21 86:5
**figured**
55:11
**films**
53:7 68:8
**final**
33:20
**finalizing**
26:21
**financially**
6:14
**find**
17:15 18:2 19:16,20 24:7 38:3 61:6,21 62:22
**findings**
18:13 60:24 88:22
**fine**
14:13 56:18 87:8,12
**finger**
63:24 64:2
**finish**
65:17
**first**
8:7 14:14,22 16:9,20 17:1 22:5,13 23:5 26:20 27:13 28:21,23,25 29:9,11 32:11 33:22 34:8,13 35:16 44:4,5 49:6 50:4,5 52:4,5,6 54:11 72:21 73:1
**fit**
51:4
**five**
9:14 11:21 20:18
**fixation**
32:2 34:21 35:7 36:15, 24 37:5 41:9 66:22 67:2,8
**fixations**
37:18
**fixator**
33:25 38:8, 11,17,20 40:23
**fixing**
36:13
**flash**
56:2
**flat**
51:9 52:25 74:1,2,3 75:1,6
**flexed**
63:11
**flexibility**
58:22 62:17 63:2 69:24 70:4 77:24 78:4
**flexible**
36:24 37:5 41:1 51:16
**flip**
49:10

**floor**
81:10
**flopped**
49:10
**flow**
18:16,17 42:7 71:9,10
**flowing**
77:22
**focused**
10:7
**folder**
55:15
**follow**
41:23 58:15 68:7 90:6
**followed**
92:10
**following**
8:20 38:7 60:22
**foot**
13:7,9 17:7, 8,9,13,16, 17,25 18:5, 15,16,19 19:1 20:7, 19,22,25 21:3,9 23:4, 23 24:2,11, 15,16,25 25:4,19,22 26:25 27:2 29:6,13 30:3,4,24 31:6 32:4,6 33:8,11,13, 24 34:1,2,4 35:4,6,9 36:7 39:5, 15,20,25 40:1,8 41:25 42:4,13,22 43:11,13,25 44:1,3 48:11,12,14, 17,21 49:1, 2,4 50:23 51:1,2,5,14, 23 52:25 53:7,8,15,25 54:2 58:23, 24 59:5,7 62:8,9 63:4, 21,25 64:1, 11,19,21 67:18,21,23, 25 69:24 70:2,3,4 71:4,7 72:18 73:1,21 74:3,12,20 75:6,9 77:25 79:12,22,25 90:16,19
**footage**
56:9
**force**
21:10,25 22:5,17,20, 21 23:4,15 25:7,17 51:23,24 54:2 62:15 64:13
**forces**
21:7 43:1 48:14 51:1 53:10 67:24 92:20
**forefoot**
21:2 63:18 64:5,10 73:24 74:10
**foreign**
43:11
**forever**
31:21
**form**
47:17
**formal**
11:9 26:20 27:22
**formed**
92:19
**forming**
42:15
**forms**
21:22
**forth**
59:19 62:2,4 69:6 84:3,5
**forward**
41:21 66:22 70:2
**found**
26:8 72:20 73:1 88:2
**four**
8:19 15:11 37:15 56:24 58:1,4,5 60:4 76:19
**fourth**
16:11 41:16, 18 43:20 44:16
**fracture**
22:7,23 25:6 26:4,5 29:3, 4,5 34:15 37:18 70:23 76:4
**fractured**
25:1,2
**fractures**
10:18 13:13 19:23 20:6 22:11 23:7, 19
**fragment**
35:1
**fragments**
34:23
**frame**
35:3
**frequently**
69:19
**friction**
31:15
**front**
20:25 40:8, 17 51:22 82:20
**full**
9:13 12:21, 23 13:2 32:25 61:17, 22 62:12 64:24 65:6 69:6 77:14 78:16 79:18, 22 83:24 84:5 85:5, 10,17 92:23
**fully**
9:2
**function**
34:4 36:5 67:12
**functional**
60:12,25 65:9 81:25 82:11,23 83:20,25 87:22
**functioning**
78:24 79:2
**fuse**
36:15
**fused**
92:5 93:15
**fusion**
66:23 67:1, 3,6,10,16 68:3 90:17, 19
**future**
67:2,3 88:4 89:3 90:10 91:6

**G**

**gain**
9:4
**Galloway**
6:11 7:9 13:19 57:25

**gamut**
12:23
**gap**
49:24,25
50:1
**Gapping**
44:15
**gave**
84:21 89:6
93:6
**general**
9:13,15 13:1
16:24 27:22
28:6 71:8
75:6
**generally**
15:15 24:6
**geometry**
34:25
**gesturing**
24:14
**getting**
41:2 43:24
**give**
7:14 56:5
65:8 82:4
83:24 85:17
**given**
28:8 37:5
43:7 44:20
69:5 83:11
90:14 91:9
92:6,11 93:9
**giving**
61:21 93:10
**gliding**
66:8,14
**goals**
26:3,4,6,16
**God**
7:15
**goes**
86:8,18 88:7
**going**
7:11,17
10:14 13:15
15:13,19
17:20,23
19:24 29:10
32:13 33:18
37:1 50:19
52:9,24 54:9
55:4,12,15
56:1,5,11,23
57:24 58:14
63:15 65:21
75:16 78:18
86:12 88:13
91:2 94:2
**good**
18:15 20:6
32:6 57:7
65:20 69:4,6
93:10
**Gotcha**
68:9 70:7
**gotta**
56:21 71:16
**gout**
47:14,24,25
**governing**
11:5,13
**graduation**
8:14
**gravity**
77:25 81:16,
20
**great**
49:20 63:24
73:23
**ground**
25:5 59:20
81:23
**guarantee**
83:19 84:7
**guess**
20:6 35:8
41:8 45:25
52:5 56:1
63:14
**guidance**
9:1

**H**

**half**
14:22 32:22
33:1 44:24
53:19 68:15
91:25 93:8
**hand**
7:13 14:12
63:20
**hands**
9:6
**hang**
55:11,23
56:17,20
**happen**
48:18
**happened**
27:7 32:10
66:16
**happening**
30:7 41:1
45:9 49:19
58:20
**hard**
50:17 51:2,4
62:5
**hardware**
28:13 36:17
43:10 76:4,
17
**hate**
15:16
**hauling**
59:16
**hazards**
28:2,5
**head**
63:5 69:18,
19 72:6
85:19
**heal**
31:7 38:15
42:25 43:24
77:20,21
**healed**
76:3 80:9
93:15
**healing**
28:7,10
30:16 35:18
37:8,11 39:6
42:3,9,13,16
70:23 71:4,
6,22 77:24
80:15,18
92:10 93:22
**heals**
45:17 67:19
**healthy**
43:24
**heard**
10:21 12:13
39:8 47:13
65:10,25
66:2
**heavy**
53:25 59:16
**heel**
20:24 40:15
63:23 81:6,
8,9,15,19,23
**height**
10:18 25:10
**held**
31:12,14,20
34:24
**help**
7:15 22:16,
17 29:21
70:22 77:19,
21
**helps**
22:15
**hey**
40:23
**high**
10:16 13:6
26:15 28:7
29:19 36:5
48:14 51:1
75:7

**high-energy** 22:3
**higher** 71:20
**highlight** 25:16
**Highly** 29:4
**hind** 20:25 67:25
**hip** 47:1 67:25
**historically** 21:16
**history** 17:2,5,11 18:21 53:17 89:23
**Ho** 13:18
**hold** 11:14 31:3,6 34:1 35:4,6 36:14,23 67:20 81:20
**holding** 21:14 32:6 34:6,8,9,10, 12 35:1 36:22
**holds** 21:20
**homo** 22:23
**homolateral** 22:23
**hoping** 29:9
**hospital** 12:10 15:5,6 16:23
**hours** 30:21
**housekeeping** 54:10
**human** 45:16
**hurt** 92:5
**hypersensitivity** 64:19

**I**

**ICU** 12:23
**identical** 29:19
**identifiable** 17:12
**identification** 57:22 58:10
**identified** 44:19
**identify** 15:17 26:1
**image** 20:13,19,22 23:11 27:4, 5,13 30:19 52:4
**images** 20:17 50:12
**imaging** 19:5,14 26:1 27:20 50:25 52:3 54:12, 19 55:10,15, 19 73:10 75:21
**imbalance** 40:5
**immediately** 10:10 23:22
**impact** 30:13 64:15 66:15,18
**imparted** 23:13 25:7
**imperfect** 65:18
**implant** 36:21
**implants** 28:13
**implies** 84:4
**importance** 79:2
**important** 21:11,22 23:20 51:18
**importantly** 49:16
**impression** 83:11
**improve** 50:15,18 70:22 90:22, 23
**improved** 62:11
**improvement** 65:11
**in-house** 13:1
**incident** 24:8 74:1
**incisions** 30:11,24 31:24
**incline** 51:8
**includes** 26:17
**including** 59:16 82:18
**increase** 78:4
**increased** 77:23,24
**increasing** 79:1
**indeed** 54:19
**independence** 35:23
**index** 63:24
**indicate** 7:3
**indicated** 90:18
**indication** 41:20 93:9
**infection** 26:6,16,17 28:8 33:10 37:6,8 42:5, 8 43:8,12
**inflammation** 47:15,18
**inflammatory** 47:7,12,23
**inflating** 30:9
**information** 20:20 82:20
**informed** 27:25
**initial** 15:5 19:12 89:12,18 90:1
**initially** 21:17
**injured** 53:6,11 59:10 62:23
**injuries** 9:23,24 10:6,7,12, 17,18,19,20 12:22 13:7, 10 17:12 21:18 22:3 23:25 30:5 35:11 36:14, 20 67:13 75:12
**injury** 17:7,9,13 19:12 23:12 24:1,7 25:18

33:1 36:24 37:6 40:17 42:11 43:15 44:12 45:6, 7,14 53:22, 24 54:4 64:16 65:17 90:15 92:7, 12
**inside** 18:4 24:15 26:13 47:16
**installation** 59:15
**insufficient** 42:7
**insufficiently** 67:20
**intact** 18:16
**integrity** 43:5
**intended** 31:10 37:16
**interested** 6:14
**intermediate** 24:22 29:2,4
**internal** 35:2
**interpretation** 52:13 76:3
**interpreting** 52:15
**interval** 89:22
**intraoperative** 33:19
**introduce** 8:4
**intuitive** 39:21
**invalid** 61:12
**involved** 10:1 11:20 59:14
**irregularities** 44:15
**irregularity** 49:7,14,15, 17
**irreversible** 50:11
**issue** 26:12 55:11
**issues** 37:11 64:17
**items** 44:18

J

**January** 78:6 79:6
**Jersey** 9:8,9 11:19 12:11
**Jewell** 6:11
**job** 60:17,18,19 61:5,16 64:25 65:5 68:18,20 82:6 85:1 88:4,25
**jobs** 82:7
**joint** 19:22 22:2 34:6,9,10 36:2 44:16, 17 47:16 48:9 49:6,8, 15,23 50:4,5 51:18 67:10, 15 72:21 73:2,20 76:4 77:23
**joints** 19:1 34:7 45:13,18 46:7,8,25 49:17,18 62:17
**Joseph** 6:11 7:9
**Judge** 13:18
**judgment** 69:5
**Judith** 57:11
**July** 15:25 82:24 87:23
**jump** 39:23
**junction** 48:1 73:22, 23
**June** 15:25 16:3, 11 38:4 49:4 54:13
**jury** 8:3,5 14:6 15:20 32:14

K

**keep** 14:2 35:22 36:4 41:1
**keeping** 35:25
**keystone** 21:22,24
**kind** 12:12 17:2 19:8 47:10, 21 50:25 59:9 86:17
**kinds** 10:12 47:11 48:4,25
**knee** 35:20 36:3 47:1,2 48:3 67:25 78:10, 19
**kneel** 63:7 70:1
**knew** 56:15
**know** 10:24 12:19 14:8 17:21 19:11 25:16 29:18 41:16 47:7,8 57:1 62:11,12 68:23 71:25 74:2,3,5 75:11,25 81:24 82:10 83:3 86:1 90:16 93:14, 21
**knowing** 31:4
**knowledge** 71:1
**knowledge-based** 11:7
**known** 61:25 62:10

L

**L-I-S-F-R-A-N-C** 20:2
**labor** 60:20
**laced** 64:20
**language** 88:7
**laptop** 56:5

**large** 10:18 17:8, 18 18:4
**largely** 62:16
**larger** 36:21,25 66:7
**largest** 63:25
**laser** 24:12
**lateral** 22:24 23:7 25:2,3 34:2 44:7 52:23 64:2 74:10
**latest** 72:9
**layer** 66:8,15
**learning** 35:20,21
**leave** 38:9,12
**leaves** 37:22
**leaving** 35:3
**left** 17:7,9,13,16 34:1,18 49:4,9,12, 14,22,25 50:1,23 52:3,10 53:5,6 62:8, 9,23 70:4 72:18,25 73:21 74:3 75:11 78:23 79:25
**leg** 40:11 78:23
**Legal** 6:12
**legged** 81:6
**length** 61:24
**letter** 85:20,23 86:22 87:19 93:5
**letting** 77:25
**level** 12:14,15,18, 20,25 13:3 35:23 36:5 61:8 69:16
**levels** 12:13,19
**lever** 51:22
**leverage** 23:15
**levers** 59:17
**license** 9:2
**lieu** 6:22
**life** 39:2 46:25
**lift** 39:20 69:17, 18,19 81:9, 23
**lifting** 69:15
**ligament** 21:19 22:5 34:12 42:23
**ligaments** 21:13,15 23:17 28:12 42:15,16,25 45:15,16,17 46:1
**limit** 70:5
**limitation** 27:18
**limitations** 69:3
**limiting** 68:25
**limits** 69:12
**line** 30:2 44:5,8 49:6 59:14, 21 65:17
**lines** 20:12 45:13 67:17
**Lisfranc** 19:21 20:1 21:19 34:12 49:15 76:4
**little** 8:4 13:16 16:6 20:1 22:16 23:10 58:12 63:1, 14,19 66:1
**live** 23:16 26:13 46:8
**lives** 42:14 66:9
**living** 66:16
**load** 54:1
**loading** 80:2
**log** 23:1
**long** 8:17 14:17 21:1 31:11 33:2 38:12 40:21
**longer** 32:23 38:15 43:6 93:16
**look** 31:18 32:23 53:6,11 73:10 89:16
**looked** 29:12
**looking** 26:19 29:11 37:12 50:22 72:1 73:5,7 92:17
**looks** 32:3 52:4,9
**loosen** 38:24
**lose** 32:14 33:11
**losing** 33:8
**loss** 49:23 66:8, 10,14
**lot** 21:16 36:19 45:5 51:13 69:23 93:19
**lower** 37:7

**M**

**made** 70:23 84:25
**magnification** 83:15 84:13
**magnifying** 84:17
**magnitude** 35:12
**maintain** 35:22
**maintaining** 58:25
**maintenance** 59:15
**major** 44:1 50:6

64:17 67:18 68:2
**majority** 46:14 47:5 80:10,11,16
**make** 14:9 17:22 45:9,10 46:19 49:12 51:2,4 59:24 64:10 84:2 86:23 87:9, 10 88:18
**makes** 37:9 39:20
**making** 7:24 35:17
**malfunction** 48:6
**manage** 12:22 37:10
**management** 9:22
**manipulation** 41:4
**manner** 6:24 7:2 19:2 25:21 36:16
**Marc** 7:5 86:15
**marked** 57:21 58:9
**match** 29:18 84:18
**matriculated** 8:15
**maximum** 65:11 83:20
**mean** 11:3 12:18 17:19 18:7 28:17 35:8 38:18 39:13 44:23 46:11 55:22 59:7 65:13 74:3 84:15,16,19 90:7
**meaning** 10:2 13:5 16:20 22:24 25:7 30:23 33:23 35:9 43:4,15 45:4 52:24 58:15 63:4 67:12 69:11 88:22 91:25 92:4, 9,18
**meaningful** 29:20
**meaningless** 67:16
**means** 10:24 11:5 23:3 37:7 39:14 65:15 66:14 67:8 80:16 90:8
**Meary's** 74:11,15,22
**measured** 63:18
**measurement** 62:15 84:4
**measurements** 44:2 62:7,9, 15,16
**mechanics** 45:9 48:17
**medial** 21:21 24:18, 19,23 27:9 29:2 41:24
**medical** 8:13,17,20 9:8,17 11:19,20 16:22 17:10 53:21 65:11 68:12 69:8 88:23
**medically** 20:25
**medicine** 8:16 12:6
**meet** 11:12 61:10
**mentioned** 25:16 46:10
**mentorship** 9:2
**metal** 30:25 36:20
**metatarsal** 21:20,25 23:6,7 24:20 28:25 29:1,3 33:23 34:8, 13,15 44:4, 5,13,17 48:2 49:7
**metatarsals** 21:8
**metatarsophal angeal** 50:4,5
**metrics** 60:11
**microphones** 6:8
**middle** 21:4 64:2
**midfoot** 19:21 21:5 22:23 36:13 37:17 43:17 47:4,6,22, 24,25 48:2,7 51:21,25
**midline** 17:24 18:1,5 24:20,21 41:24
**mild** 72:20 73:1 83:13 84:9
**mildly** 15:22
**mile** 90:4
**millimeter** 49:24,25
**millimeters** 31:1,2
**mind** 52:22
**Mine's** 89:20
**Minimal** 49:25 50:1
**minute** 70:12 86:10
**missed** 16:14
**mistaken** 71:2
**mobility** 35:20
**mode** 18:23
**moment** 6:3 25:13 54:8 87:14
**monitor** 32:19
**monitoring** 35:17 38:4 48:21
**months** 35:13 42:11
**motion** 36:2 45:18 62:13,17 63:3,8 69:12 92:23
**motor** 10:16
**move** 19:2 36:3 55:13 66:22
**moved** 22:25
**movements** 69:11

**MTP**
72:21 73:2, 20
**multi-fragmentary**
25:5,11
**multiple**
19:22,23 20:5,23 26:4 28:15 92:16
**muscle**
30:8
**muscles**
23:21 25:20 36:3 39:18, 20,21,22,24 40:3,6,7,14, 16 46:7,9
**musculoskeletal**
10:7

**N**

**nail**
31:14
**name**
6:11 7:4
**named**
21:16
**Napoleonic**
21:18
**narrowing**
44:16
**natural**
40:5 92:10
**necessarily**
37:21
**necessary**
13:18 61:7
**neck**
34:15
**need**
7:20 8:2 12:1 14:9,13 38:25 56:1 64:4 70:12 88:18
**needed**
39:1 51:13 63:6 90:8
**needs**
33:24 34:3 38:15 51:15 64:5
**nerves**
23:21
**neurosurgical**
12:25
**neutral**
63:10 74:15
**never**
31:9 42:24 45:18 67:12 85:4
**Newark**
9:9 12:10,11
**night**
10:9 24:8 26:2 29:9 32:9,11
**non-smoker**
92:6
**non-smokers**
71:13
**normal**
26:11,14 29:17 44:3,7 46:17,21 47:3 48:17 49:23 53:5,8 59:7 62:21 74:23 75:9
**North**
9:18
**note**
6:7 72:9,13 75:16,18 76:8,12,24 77:1,3 78:7 79:8 80:6 81:3 88:11, 14,17,21 89:5,10,17 90:12 91:7, 23
**noted**
89:12 93:4
**notes**
72:2,5 75:17 79:4 90:12
**noting**
25:21
**November**
16:2 44:23 54:15 76:22, 24 77:1,2,4
**nowadays**
91:25
**number**
10:6 91:8
**nursing**
12:23

**O**

**oath**
6:23
**object**
54:1 55:10 88:6
**objection**
13:21,22 54:25 57:2, 19,20 58:5,6 85:12
**objections**
7:1
**objective**
60:8 62:15, 16 65:7 84:17 88:22
**obtain**
29:16
**obtained**
19:13
**obvious**
35:8
**obviously**
7:25 28:17 31:21 41:15 44:23 55:23
**occasion**
54:11,17 58:15
**occasional**
79:14
**occasionally**
69:16,18
**occur**
22:8 23:1 40:17 46:25 47:25 68:4
**occurred**
22:22 32:24 45:7,11 66:15
**occurring**
68:2
**occurs**
22:19 23:12, 17 39:17 45:18 63:3
**October**
16:1 76:11, 16 85:21,23 86:14 88:14, 17 93:5
**off-the-record-discussion**
57:18
**offer**
13:19 54:23 57:25 58:8
**offered**
68:11
**office**
15:1 41:23 60:13 62:14
**okay**
13:10,24 14:2,8,9,21 15:2,23 18:2,9,12 19:5 20:4, 12,15 27:1, 6,15 28:20

29:15 31:8, 16 32:8,18 33:15,21 35:14 39:8, 16 41:15 44:22 46:15 47:11 48:24 49:3 50:19, 22 51:6 52:9,16 54:7 57:5 63:12 64:7 68:14 70:13,14 71:2,8,12, 15,22,25 72:14,17,19 73:8,15,20, 25 74:5 75:1,4 76:1, 2,7,11,13,18 77:10,13,18 78:9,12,15, 22 79:8,10, 16,21,24 80:4,7,12 81:2,4,12, 15,24 82:3, 10,13,15,19, 22 83:2,11, 23 84:12,16, 20,24 85:4, 20 87:12,18, 22 88:2,13, 15,20 89:5, 9,11,25 90:3,6,9,12 91:2,11,14 92:3 93:4

**older** 46:12

**once** 20:14 30:2 67:2,7

**one** 6:2 7:20 12:14,15,18, 20,25 13:3 15:14 16:8 19:24 20:17 21:12,13,15, 17 22:13 23:2 25:1,8 26:5,16 28:10 29:11 31:17 32:21 34:9,10,11 35:12 36:10 41:21 42:5 52:2 56:7,8 57:14 66:10 69:22 72:7, 20 73:4 74:13 82:16, 19 84:25 86:14,17,19 87:14 93:22

**one's** 31:2

**ongoing** 42:13 43:12 54:18

**open** 13:13 26:4, 5,7 27:8 37:5 43:7

**opened** 41:25

**opening** 29:25

**operate** 33:3

**operating** 10:5 26:22 27:21 30:4, 21

**operation** 41:18

**operative** 36:15 56:24 58:1,4,5

**operatively** 19:4

**opinion** 53:20 60:3,8 61:4,25 82:5 85:8,17 89:6

**opinions** 60:11 68:11

**opportunity** 42:4 43:12

**opposed** 37:4 77:24

**opposite** 29:12 52:19

**option** 37:19 43:10

**optionality** 37:22

**options** 36:9 37:22 43:9 90:20

**order** 28:3 34:4 51:12 64:4

**originally** 43:15

**orthopedic** 9:14,15,17, 19 11:19,21, 22 12:17 13:1,3,7,20

**orthopedics** 9:21

**osteoarthritis** 46:22 47:9 66:2,13

**osteopenia** 79:25

**outcome** 6:14 33:20 44:20 60:25

**outcomes** 11:7 45:20

**outliers** 65:21

**outpatient** 14:25 15:3, 22,24

**outside** 26:8,10 31:19 35:3 60:10,11

**overcome** 40:7

**overwhelming** 47:4,5

**owing** 28:11

**P**

**P-13** 55:10

**P-14** 58:9

**p.m.** 94:6

**PA2653** 88:17

**pack** 72:7,11 91:21

**packs** 71:25

**page** 83:3,4,8 87:11 89:16

**pages** 82:16 89:21

**pain** 17:7 27:18 35:23 46:5 51:1 68:21 79:12,14 82:22,24 89:12,18,25

**painful** 64:20

**paperwork** 61:15

**paramount** 26:5

**part** 20:23,25 29:21 54:18 82:4

**participate** 8:21

**participated** 11:23
**participating** 6:19
**particular** 93:23
**particulars** 14:10
**parties** 6:7,25
**party** 6:13
**PATH** 85:7,16 87:20 88:21
**pathologic** 75:8
**pathologicall y** 75:5
**patient** 10:11 13:25 14:3,17,18, 19,22 16:20 41:22 66:24 70:19 81:20 87:6 88:24
**patient's** 62:20
**patients** 9:5,22 10:5 11:8,10 32:1 37:18 46:21 60:6 68:7
**pause** 7:18
**PDF** 87:1
**pedantic** 15:16
**pedigree** 8:6
**peer** 11:23
**pelvic** 10:17
**penalty** 6:25
**people** 9:22 20:24 21:2 24:14 32:5 36:19, 22 46:14,17, 19,20 47:13 64:1 85:7 93:18
**perceive** 18:18
**percent** 67:11
**percutaneous** 32:2
**perfect** 44:11 45:10
**perform** 15:8 25:25 27:22 62:7 69:15
**performed** 27:10
**performing** 18:20 88:24
**perfusion** 18:16
**periodically** 17:20
**perjury** 6:25
**permanent** 31:5 37:16 50:13
**person** 6:23 7:20 40:21
**personally** 13:6 60:23
**Pes** 74:5,9,13,25
**phase** 35:16
**phrase** 71:16
**physical** 17:11 35:19 38:2,5 40:25 42:12 58:14, 16 60:13 80:12,21 82:5 88:4 89:2
**physically** 6:20 10:2
**physicians** 9:3
**pick** 6:8
**picked** 62:3
**picture** 67:7
**pieces** 25:10 34:22 35:1
**pins** 30:25 31:12 34:19,21 38:10
**place** 6:6 16:8 19:3 21:7,24 30:11,23 31:12,15,20 35:2 41:17
**plain** 19:9,10
**plaintiff** 7:6
**Plaintiff's** 54:24
**plan** 77:13 78:22 79:6
**plane** 25:8 52:14 53:12
**planes** 62:13
**planned** 38:16,18
91:4
**plans** 91:6
**Planus** 74:5,9,13,25
**plate** 36:20
**please** 6:7 7:3,12 54:9 57:10 82:13
**point** 12:7 13:19, 24 41:9,13 42:10 43:4 49:11 50:16 53:16,20 54:24 61:21 64:25 65:18, 20 76:2,8,15 77:11,18 79:19 80:9 91:7
**pointed** 58:25
**pointer** 24:13
**pointing** 29:7
**poking** 24:19
**poor** 30:16
**population** 71:20
**portion** 21:4 29:24
**position** 31:6 62:18 63:6,10,11 70:2 85:18
**positioning** 59:7 70:1
**positions** 51:3 70:5
**possibility** 43:8 84:5

**possible**
15:18 27:17
**possibly**
84:19
**post-traumatic**
9:25 45:4
66:3,6,14,19
68:5
**postgraduate**
8:24
**potential**
30:16
**pounds**
69:15,17,18,19
**pouring**
27:19
**powerful**
39:19,23
40:6,16
**practice**
12:4,6 13:5
14:23 36:4
**practicing**
9:1
**pre**
43:15
**precautions**
38:7 59:1
69:20
**precise**
21:10
**predict**
50:17
**preferred**
14:12
**preinjury**
59:5,6
**prepare**
57:25
**Presbyterian**
8:9
**prescribed**
38:13,21
**present**
6:20 11:10
**preservation**
50:6
**preserved**
44:1
**pretty**
91:17
**prevent**
35:25 71:4
**preventing**
42:9
**prevention**
35:24
**primary**
26:16
**prior**
16:17 44:11
59:10 61:5,8
73:16
**private**
6:9
**privileged**
46:17
**PRN**
90:7
**probability**
68:12
**problem**
39:1 67:22,23
**problems**
37:8,10
93:20
**procedure**
29:22
**proceed**
27:15 32:8
**proceeding**
76:9
**proceedings**
6:16
**process**
27:25 28:4
**professional**
60:7
**professor**
11:18
**profile**
20:17,18
**program**
80:13,21
**progress**
6:4 57:15
58:22,23
78:15 87:15
**progressing**
38:5
**progression**
92:10
**progressive**
92:17
**projectional**
19:9 52:13
**pronation**
63:18
**prongs**
63:22
**proper**
35:2
**properly**
28:11
**pros**
36:19
**protective**
59:22
**protocol**
38:2
**protocols**
83:14 84:10
**provide**
68:22,24
**provided**
88:25
**provides**
43:5 60:19
**proximate**
66:12
**psychologically**
32:5
**public**
75:6
**publications**
11:24
**pull**
16:7 59:18
69:22 74:16
77:5 82:13
85:25 86:20,21
**pulling**
50:7 63:4
**purpose**
25:4 28:9
39:2 40:11
41:18
**purposes**
7:19 8:2
**pursue**
91:10
**push**
39:19,21
51:22
**pushed**
23:4
**pushing**
39:15 40:1,4
**put**
19:2 35:9
36:6,14
37:15 52:19
55:16 60:14
62:2 75:24
80:24 84:3
**putting**
34:7 62:4
69:6 78:3
84:5
**PX-13**
57:3,19,21
**PX-14**
56:24 58:4

**Q**

**quarters**
23:24
**question**
7:18 47:20
52:3 59:8

65:2 71:18
**questions** 70:9 91:20 93:12 94:1
**quick** 47:20 55:21 91:17 93:14
**quite** 75:9
**quote** 78:23 89:18

**R**

**radiographically** 24:5
**radiographs** 92:16
**radiography** 19:9 52:13
**radiologist** 72:24
**rail** 17:8 59:14,18,21
**railroad** 61:5 64:25 65:6 68:17 82:6
**rails** 59:15
**raise** 7:12
**range** 44:7 62:12,17 69:11 75:10 92:23
**ranging** 10:15
**rare** 47:4
**rate** 26:16
**reach** 61:4
**reached** 43:4 65:20 68:10
**reading** 14:11
**ready** 7:21 32:19,23 33:2 57:9,12,13
**real** 55:21 93:14
**realigned** 26:24
**realigning** 27:2
**reason** 39:17 41:21 47:15,19
**reasonable** 53:21 65:23 68:12 69:8
**rebuild** 45:16
**recall** 72:6 75:14 85:19
**receive** 9:23 12:20 24:4 25:22 60:24
**received** 65:9
**receives** 66:18
**receiving** 9:3,6
**recent** 64:22 89:10 91:23
**recognize** 23:20
**recollection** 14:10 88:21
**recommendations** 83:17
**reconstructable** 34:22
**Reconstructing** 67:15
**reconstruction** 37:7
**record** 6:4,7,16 7:4 55:5 57:6,15 86:9,13 87:15 94:3
**recorded** 6:10
**recording** 6:3,6 55:5 57:15 86:13 87:4,15
**recover** 61:22
**recovered** 90:13
**recovery** 38:5 78:23,25 93:16
**reduce** 18:24 26:6 28:9 45:8 70:23 71:6,10
**reduced** 26:24 63:2,8 64:8 81:16,20
**reduces** 71:8
**reducing** 26:17 27:2,20
**reduction** 27:13 70:21
**reductions** 34:7
**refer** 20:24 21:1,2
**referred** 21:5
**reflect** 83:17
**refresh** 14:9,13 88:20
**regaining** 35:19
**regard** 14:3
**regarding** 39:12
**regrow** 42:15 45:16
**regular** 13:11
**Regularly** 13:12
**related** 6:13 46:6
**relevant** 83:13 84:10
**reliability** 83:6
**relied** 82:4
**remain** 63:10
**remember** 45:25 56:8
**remote** 6:16
**remotely** 6:21
**removal** 38:17,19 43:21 59:15 76:17
**remove** 37:19 43:10
**removed** 38:25 39:2 67:14
**removing** 26:19 30:1 40:22

**repair**
37:1 67:8
**repeat**
65:1 92:8
**rephrase**
85:14
**replacements**
47:2
**replacing**
34:12
**report**
58:1 72:23
73:10,11,13
**reported**
90:3
**reporter**
6:15,18
7:11,17
57:13
**reporting**
6:21 7:2
**reports**
56:25 58:4,5
**represent**
42:5 53:8
63:23,24
64:2 83:20
**represented**
24:17
**represents**
25:3
**require**
28:14 34:15
43:6 69:20
**required**
21:24 35:6
**requirements**
61:10 88:4
89:2
**requires**
12:25 51:23
**research**
22:16 93:19
**residence**
11:21
**residency**
8:21,23,24
9:7,10,15
11:20
**resist**
22:20
**respect**
82:7
**respond**
42:21
**responds**
47:18
**rest**
17:10 67:24
**restore**
45:6,8
**restrictions**
68:24 80:24
81:1 85:9
86:19
**restroom**
70:13
**rests**
32:7
**result**
45:21 46:5
52:18 53:14
64:16
**results**
63:6 83:14,
19
**return**
59:4 60:1
61:4 64:24
65:5 68:17
85:1,5,10
88:3 89:2
**returning**
60:7 61:17
62:20
**review**
11:9 54:12,
18 60:23
82:14
**reviewed**
11:24 82:11
**reviewing**
72:5
**rheumatoid**
47:14
**rid**
78:19
**right**
6:2 7:12
15:13 16:16
17:1 19:15,
24 24:6
25:12,24
27:3 28:2,16
29:10,23
31:11,18
33:5 37:12,
23 41:7,10
46:2 48:21
49:1,2,9,12,
13,20,22
52:1,6,7
53:3,5,6
54:17,22
56:20 57:8,
11,17,24
58:7 59:3
61:12 62:8,
23 64:22
68:9 69:10
70:2,3,8,17,
25 71:16,22
72:11 73:17,
21 74:12,20
75:2 76:5,8,
14,15,19,21,
22 77:11,16
78:6,10,13,
16,18,20
79:11,17,19,
22 80:10,13,
22,25 81:2,
5,15 82:1,11
85:2,5 87:2,
12,25 88:5
89:9,13
90:1,4,10
91:3,7,8,11,
12
**rigidity**
92:20,22
**rise**
53:12 81:6,
8,9,15,19
**risk**
28:5,6,7,9,
10,12,14
33:8 37:6,7
91:1 93:21
**risky**
43:10
**road**
37:8,22
**robust**
26:15
**robustness**
43:1
**rocks**
59:20
**Roman**
21:23 24:24
**room**
6:20 17:22
26:22 27:21
30:4,22
**ropes**
21:13
**rotate**
64:6
**rotation**
64:8,9
**route**
67:2
**routinely**
13:14 38:12
**rule**
67:1,3
**running**
25:21
**runs**
12:23
**rupture**
28:12 45:15
**Rutgers**
9:8 11:19

**S**

**safe**
9:6 11:12 18:23 31:6, 24 32:6 33:3
**safer**
37:10
**salvage**
33:13
**satisfied**
54:19
**saying**
41:8 61:12, 14 77:3 83:23 84:1 88:21
**says**
78:23 82:19 84:11 89:17, 25 91:7
**scan**
19:14 72:25 73:3
**scans**
72:18,20
**scar**
42:16,20,21 45:17 92:19
**scarring**
46:9 67:19
**scenarios**
47:14
**Schanz**
34:21 38:10
**scheduled**
90:9 91:11
**schematic**
25:18 40:9, 11
**school**
8:13,16,17, 20 9:9 11:19
**scooter**
35:20 77:15, 19 78:10,19
79:21
**screen**
28:18 29:11 54:8 55:12, 16 75:25 86:6
**screening**
19:10
**screw**
34:9,10,11, 25
**screwed**
31:17
**screws**
34:6,8,24 35:3 36:9,22 37:4,6,15,19 38:9 41:12 42:12 43:6, 21
**scroll**
55:20 83:2
**sec**
55:2
**second**
16:10 21:20 23:6 24:16, 21 29:1 32:24 34:10, 13 37:13 44:13 52:4 57:14 63:8 83:3 89:16
**section**
82:19 83:7
**see**
9:5 15:22 19:17 20:11, 22 22:7 23:18 24:1, 11,13 25:9 27:3 28:22, 24 30:25 32:5 33:17 34:14 38:3 43:17,25 44:12,13,14 47:21 49:7, 13,19,21 50:2,3,6 52:21,22,23 53:11 54:4 55:12,16 62:20 63:20 67:13 73:12 74:16 79:3 82:19,25 83:5,6,21,22 86:22 88:10, 16,19 89:4, 19,24 91:6
**seeing**
15:23 50:8, 12 60:15
**selection**
11:8
**self-explanatory**
65:14
**sensation**
18:18 64:16, 18
**sense**
39:21
**sensibility**
48:10
**sensitive**
6:8
**separate**
23:2
**separated**
22:1,2 24:22
**September**
16:1,12,13, 15 41:17,22 54:14 86:4, 15,16 87:19
**sequelae**
9:25 45:4
**served**
39:3
**services**
16:23,25
**sessions**
59:2
**set**
12:21 25:20 32:4 60:15 65:23
**seven**
10:8
**several**
19:1 59:17 85:8
**severe**
17:6,12 33:9 48:10
**severity**
12:22 90:14 92:7,11
**shadow**
52:15
**shape**
39:5
**share**
55:12 75:21 86:2,5,24 87:1 88:13
**shared**
40:9
**sharing**
56:22
**sheet**
82:18
**shoes**
51:5 64:20
**show**
20:16 23:11 24:5 26:25 32:24 33:19 43:17 56:24 60:9 69:7 73:5 85:22
**showed**
30:19 74:12 79:24
**showing**
20:17,18 67:18 87:5,6 88:16
**shows**
33:22 53:8

**side**
17:17 18:5 22:24 23:5 24:11 29:17 34:1 40:8,14 41:24 42:4 44:2,6 49:14,21,22 51:20,21 52:18,20 53:11 62:20, 23

**sides**
47:21 48:18

**signals**
62:3

**significant**
10:19 18:14 29:6 62:2 68:20,21 79:12

**significantly**
30:4 71:19

**signs**
62:4

**similar**
20:18 21:23 25:21

**simple**
10:15 34:24

**simpler**
49:12

**simplest**
46:23

**simply**
66:7

**single**
32:13

**single-leg**
81:15,19

**sinus**
42:2

**sir**
81:18 85:24

**sit**
54:10 68:9 90:10

**site**
10:19 19:12

**size**
31:1,2 34:25

**skeletal**
9:23

**skin**
24:11,17,19 26:7,13,14 30:1,7,10, 11,13,15,17, 19,23 31:3, 7,24,25 34:20 38:10, 12 42:1,6,9 43:7,22

**slanted**
51:17

**slip**
10:15

**slow**
17:23 19:25

**slowing**
78:25

**slowly**
7:20 80:3,18

**small**
21:6 31:24 34:23

**smoked**
70:16

**smoker**
70:20 92:6, 12

**smokers**
71:12,23

**smokes**
70:25 72:1 91:21

**smoking**
70:22,24 71:3,10,20 92:4 93:16, 21

**smooth**
49:6 51:8,12 66:8

**smoothness**
49:13,14,16

**so-called**
24:24

**soft**
25:17 35:17 67:19

**solution**
31:5,10 68:3

**somebody's**
84:16

**someone's**
84:3

**sort**
14:10 15:16 20:9 54:9 56:25 65:13

**South**
8:9,15,16

**space**
44:14 49:8, 15,16,23

**speaking**
7:20 36:13

**specialized**
9:3

**specific**
60:14 81:1 93:20

**specifically**
63:8

**speed**
10:16

**spent**
93:19

**spinal**
10:17

**splitting**
23:1

**squat**
63:7

**stability**
31:5 35:6 42:11 63:12

**stabilization**
19:13

**stable**
64:20 67:20 76:4 81:22

**staffing**
12:23

**stage**
32:18 38:18

**staged**
38:16

**stamped**
88:17

**stand**
81:10

**standard**
11:12 13:3 17:10 18:22

**standards**
12:21

**standing**
40:13

**standpoint**
88:8

**start**
6:3 20:21 78:3

**starts**
8:1 31:7

**state**
12:17

**statement**
6:15 93:7

**stating**
7:4

**stay**
76:18

**sticking**
27:8 31:25 34:20 38:11

**stiffness**
41:2 46:4,5, 6 50:25 51:2,12 69:23

**stitches**
36:23

**stomach**
26:10

**stomp** 48:13
**stomping** 48:15
**stool** 63:22
**stoop** 63:7
**stopped** 55:5 86:13
**straight** 52:10 53:9
**straighten** 43:14
**straightforward** 43:9
**strength** 37:1
**strengthen** 78:4
**strenuous** 60:20
**stretch** 41:3,5
**stretched** 40:2,3
**stretches** 30:9,10,13
**strike** 71:17
**strong** 35:22
**stronger** 37:4
**strongly** 48:13
**struck** 17:8 53:25
**structural** 43:5 92:20, 22
**structure** 43:14
**students** 11:20
**stuff** 55:23 87:6 93:15
**sub-discipline** 9:20
**subcutaneous** 30:8
**submaximal** 62:4
**submaximum** 83:13,19 84:9
**substantive** 88:8
**subtalar** 51:18
**sufficient** 31:4 35:5
**superimposed** 20:20
**supination** 63:19
**supple** 25:4
**supply** 66:17
**support** 6:12 38:16 43:6 59:21
**suppose** 68:6
**supposed** 19:2 42:23 58:17
**sure** 17:22 26:3 35:17 38:1 63:1 65:3 67:11 69:1 73:4 75:19 77:22 79:5 81:8 86:1, 11,23 87:9, 10 89:14 92:9
**surface** 43:23 51:8, 16,17,20
**surfaces** 51:6,12,14 63:13 64:5, 11,12,13 69:21
**surgeon** 12:24 21:17
**Surgeons** 12:16
**surgeries** 15:8,10,11, 15 16:5 27:11 28:15 35:14 58:1 60:5
**surgery** 9:14 13:1,20 15:7 16:9, 10,11,24 27:12 28:9 32:24 33:16 34:16 37:13, 14,24,25 39:4 41:8 43:20 91:3
**surgically** 33:12
**sutures** 36:23
**swear** 6:16 7:12,13
**swelling** 18:14 30:7,9 51:4
**swollen** 30:5
**symmetry** 29:20
**symptom** 83:15 84:12
**symptoms** 45:20 50:24 84:17 90:21
**system** 26:15 32:2

**T**

**table** 81:21
**tactics** 36:18
**take** 6:6 25:17,25 27:21 36:3 38:8 54:8 62:16 76:21 82:6
**takes** 45:13
**taking** 10:9 80:18
**talk** 15:14 20:7, 10 33:16 58:12
**talked** 20:1,5 40:22 43:8 63:14 66:1,21 87:22 90:20, 21
**talking** 14:6 20:4,9 49:1 55:13 56:8 61:1
**talus** 33:23 40:12 44:6
**tarsometatarsal** 34:9,10 49:17,18
**tasks** 60:15,16 61:7,9 70:5
**teaching** 11:20
**team** 16:24,25

**tear** 24:10,17 46:18,22 47:3
**tearing** 23:17
**tedious** 15:19,21,22
**tell** 22:13,21 28:22 33:9 37:18 56:10, 12 58:19 81:6,16
**ten** 12:3
**tend** 24:4 71:15
**tendon** 18:6 40:3 48:6,16
**tendons** 23:21 25:20 45:25 46:1,7
**tension** 23:15
**term** 10:21 22:2, 22 38:13 39:8 45:4 65:10 66:11 74:6
**terms** 39:4,6 42:21 63:12 64:16 68:24 69:11, 12 80:15
**terra** 66:13
**test** 11:6,7
**testified** 81:25 82:4 84:20
**testimony** 6:24 7:13 8:2
**tests** 60:15
**thank** 7:21,22 16:16 70:11, 14 72:4 75:22 87:18 91:15,16 93:12,24 94:1
**that'll** 18:9
**theory** 68:6
**therapists** 60:14
**therapy** 35:19 38:2,6 40:25 42:13 58:14,16 59:1 80:13, 21,25
**thing** 15:16 25:15 26:20 41:9 49:23 52:6 87:6 93:3,23
**things** 9:5 18:10 20:10 21:14 26:10 29:9 34:17 38:9 42:5 45:5 47:8 62:6 65:22 83:24 91:9 93:20
**think** 22:10 25:14 32:14 41:16 46:18,20 55:14 56:6 65:19 68:19 69:2,8 72:9, 10 75:1 76:3 81:24 82:3, 8,23 84:20 87:8 89:11 90:12,21,24 91:5,7,22
**third** 10:9 16:10 23:6 24:25 29:3 39:4 41:8,15 52:5,6 63:9
**Thomas** 7:7
**thought** 33:4 56:14 63:21
**three** 10:9 20:16 32:25 35:13 42:10 63:22 64:4
**thresholds** 60:21
**throw** 78:19
**thumb** 63:23
**tibia** 40:12
**ties** 59:18
**tight** 21:25 23:24 63:9
**tightly** 21:12,20 23:22 64:20
**time** 6:4,14 7:20 14:19 20:7 26:11 30:3, 6,21 32:15 33:1,6 38:8, 13,21 39:24 40:4 45:14 55:5 57:16 61:24 67:10, 16 68:8 70:9 78:13 79:11 80:25 81:13, 14 86:13 87:16 90:18 92:16 93:17, 19 94:3
**timeframes** 12:25
**timeline** 36:1 38:6 89:13,18 90:1
**times** 14:23 15:2,6 67:9,17 85:8
**tire** 46:24
**tissue** 28:12 29:25 30:6,8 32:7, 19,20,22 33:2 35:17 41:5 42:14, 16,20,21 43:7,24 45:17 67:19 80:17 92:19 93:22
**tissues** 23:16 24:1,2 25:17,22
**today** 14:6 68:10 90:10
**toe** 48:1 49:20 50:2 52:6,7 53:14 63:11, 25 64:3 73:21,23
**toes** 18:17 21:1 40:13,14 43:13 52:4, 6,17,20,23 53:9,12 58:24 63:4, 8,9
**told** 37:14 40:23 71:3

**tolerated** 77:14
**Tom** 13:17 54:23 56:23 58:3 73:9 86:7
**Tom's** 87:9
**tomorrow** 56:11
**tool** 84:2
**top** 20:17,21 25:19 42:6 64:18,21 72:6 85:19 91:20
**total** 15:11
**trackman** 88:25
**tract** 42:3
**trailing** 39:25
**train** 10:12
**trained** 60:14
**training** 8:24 9:4,11, 13,16
**transmission** 7:19 21:11, 25 51:23,24
**transmit** 67:23
**transmitted** 21:8 64:14
**trauma** 9:17,19 10:5,9 11:22 12:11,12,14, 16,17 13:1,4 15:5 16:23, 24 24:4 28:11 30:14 42:7 47:6 48:9 53:15 66:15 73:16
**traumatic** 10:6 28:6
**traumatized** 9:22 29:25 30:15 45:13 80:17
**traversing** 63:4
**Travis** 6:11
**tread** 46:24
**treat** 13:6,10 14:14
**treated** 19:4 33:12
**treating** 10:10 15:23 53:22,25
**treatment** 9:24 18:22 22:18,19 26:4 32:12, 15 33:7 35:15,19 53:18 54:18 59:4,25 60:23 68:16 75:16 90:18
**treatments** 36:17
**trial** 8:1
**true** 70:18 71:21, 24 78:17 82:2 85:3,6
**truth** 7:14,15
**try** 24:12 31:25 36:15,22 64:13 88:13
**trying** 29:18 35:25 36:2 40:25 61:22 87:9 93:19
**turn** 13:15 56:21 80:18
**twisting** 10:16
**two** 14:21 20:12 32:21 34:8, 11,17 36:13 37:3 42:5 46:25 48:8 52:14 53:12, 19 66:9 68:15 76:16 81:5 91:25 93:8
**two-leg** 81:8
**type** 13:11 54:3
**types** 18:10
**typically** 38:14

**U**

**U.S.** 6:12
**Uh-huh** 16:9
**ultimately** 37:14 50:10 52:1 60:24
**unable** 63:9
**uncommon** 47:24
**undergoing** 35:15 87:24
**undergraduate** 8:11
**underneath** 38:10
**understand** 10:14 29:21 84:8
**understanding** 22:17 39:11 59:9,12,13 60:18
**Understood** 80:20 93:24
**undo** 45:7,10,14
**uneven** 51:8,14,20 59:20 63:13 64:5,11,12, 13 69:21
**unfortunate** 44:19
**uninjured** 62:23
**union** 71:17
**unions** 71:19
**united** 92:15
**University** 8:15 12:10 16:23
**unsafe** 30:11,23
**upper** 35:22 81:22
**USB** 55:18 56:1
**UTC** 6:5 55:5 57:16 86:13 87:16 94:3

## V

**valgus** 17:17,19 18:3
**variation** 44:8 83:14
**vectors** 22:17
**vehicle** 10:17
**verbally** 6:24
**verbatim** 14:11
**versus** 51:8,9 66:23
**vessels** 23:21 30:14, 17
**video** 6:4,5,10 55:2,4 57:9, 15 86:12 87:15 94:2
**videographer** 6:2,12 55:4 57:8,11,14 86:12 87:14 94:2
**videotape** 55:6
**view** 43:25 44:2,6
**violent** 23:4 30:5 36:24
**visit** 15:17 32:14 38:4 72:16 78:10 81:6 90:4
**visits** 14:25 15:1, 14,22
**visually** 19:17

## W

**waist** 69:16
**wait** 32:19,23 33:2
**waive** 7:1
**walk** 20:9 32:15 33:14 35:13 37:23 39:25 48:12 51:12, 14 64:5,10, 13 90:4
**walking** 21:9 28:17 39:22 40:2, 5,18,22 43:2 51:7,8,17,19 59:19 63:13 69:21 79:22
**wall** 52:15
**want** 14:8 15:19 17:21 22:20 23:11 25:24 33:16 37:2 46:19 56:10 57:5 58:12 70:12 78:24 80:12 86:20, 22,23 87:1, 10
**wanted** 56:15 68:25 76:18 77:18 78:3 80:20 89:1 90:6
**wars** 21:18
**washed** 26:24
**washing** 26:18 30:2
**water** 27:19 70:12
**way** 7:25 8:5 9:11 11:17 18:1 19:16 26:8 29:7 32:6 42:8,22 43:14 46:21 48:21 56:22 62:10 84:25
**ways** 36:13
**weaker** 40:7
**wean** 77:14
**wear** 46:18,22 47:3 59:23
**wearing** 46:24 64:19 77:12 78:12
**week** 8:1 10:8 32:21 72:1, 7,10,11
**weekly** 13:7,9
**weeks** 32:21 33:1 35:7 38:14 76:16,19
**weight** 35:10 36:7 69:12 78:3
**weight-bearing** 53:7 68:7 77:13,14 78:16 79:18, 22 92:16
**weights** 53:9
**went** 26:21 33:17 72:17
**whispering** 6:9
**widening** 44:14
**Wietzke** 7:5,22,23 13:17,23 54:23 55:3, 9,22 56:2,6, 13,20 57:5, 10,17,23 58:3,7,11 70:8 73:9 75:20 85:12 86:11,16 87:2,8 88:6 91:16,18 93:11
**Williams** 8:4 13:25 14:15 16:17, 19 17:2 22:9,22 24:9,10 53:18 54:20 61:21,25 68:16 70:16 71:3 72:1 73:25 83:12 87:7 93:5
**Williams'** 60:11 64:8
**Williams's** 48:21
**wires** 31:1 32:3
**withdraw** 71:17
**withdrawn** 12:5
**wither** 78:2

**withers**
78:1
**withstand**
43:1 92:20
**witness**
6:17,23
7:10,16
70:14 73:12
75:22 85:13
86:24 87:5
88:10 94:4
**woke**
41:7
**wood**
31:14
**word**
45:24
**words**
17:21 38:24
61:11 65:15
**work**
8:3 17:7
35:2 36:8
42:21,24
59:9 60:1,4,
7,14,19,21
61:8,17
64:24 65:5
68:17 83:16,
17 85:9,17
**workability**
83:21
**worked**
8:1 59:13
**working**
17:8 29:24
40:25 42:8,
12 62:5 82:5
**worries**
75:18
**worse**
50:16,18
80:19
**worst**
82:25
**worth**
25:21 63:15
**wound**
18:4,24
26:7,22
27:4,5,7,8
28:7 37:8,11
41:24,25
42:3 43:7,22
71:13 80:14
**wounds**
35:18 80:9
**written**
72:12 76:6
88:11
**wrong**
68:1
**wrote**
87:19,23
88:21 89:5

**X**

**X-RAY**
19:11 26:25
27:3 28:18,
19,21,22,23
52:19,21
74:12,16,21
**X-RAYS**
19:10,15
22:11 29:16,
20 33:19
52:14 74:16,
19 76:2
79:24

**Y**

**yeah**
9:12 13:9
32:11 39:7
41:19 47:11
53:2 55:3,9,
14 56:2,3,13
57:7 62:14
65:16 66:25
69:14 77:5
86:16 87:11
91:9
**year**
8:14 9:13,16
10:8 44:24
**years**
8:19 9:14
11:21 14:22
53:19 62:10
68:15 92:1
93:8

**Z**

**zero**
33:10
**zone**
21:3
**Zoom**
55:13

# COURT EXHIBIT 2

**United States District Court**
**Southern District Of New York**
**40 Foley Square**
**New York, New York 10007**

***Dale E. Ho***
***United States District Judge***

# JURY NOTE

Page 18-bottom references, "life expectancy and work life expectancy numbers have been discussed on the record."

Page 23-middle references, "evidence concerning life expectancy and work-life expectancy.".

We are respectfully requesting the applicable life-expectancy table.

DATE: 8-20-26

[redacted]
FOREPERSON'S SIGNATURE

TIME: 4:21 PM

THIS SECTION IS FOR COURT USE ONLY

COURT EXHIBIT: #2
DATE RECEIVED: 8/20/26
TIME RECEIVED: 4:27 pm

# COURT EXHIBIT 3

**United States District Court**
**Southern District Of New York**
**40 Foley Square**
**New York, New York 10007**

***Dale E. Ho***
*United States District Judge*

# JURY NOTE

Verdict reached.

DATE: 8/20/26

[redacted]
FOREPERSON'S SIGNATURE

TIME: 5:15 PM

THIS SECTION IS FOR COURT USE ONLY

COURT EXHIBIT: #3
DATE RECEIVED: 8/20/26
TIME RECEIVED: 5:16 p.m.

# COURT EXHIBIT 4

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------X
EDUARDO WILLIAMS,

Plaintiff, 24 Civ. 9536 (DEH)(JW)

-against-

PORT AUTHORITY TRANS HUDSON CORP.,

Defendant.
----------------------------------------------------------X

**VERDICT FORM**

**1. Has the Plaintiff proven that the Defendant was negligent in any manner claimed by Plaintiff?**

Yes __X__ No ______

If your answer is Yes, please proceed to Question 2.

If your answer is No, please skip the remaining questions and have the foreperson sign the last page.

**2. Has the Plaintiff proven that the Defendant's negligence caused, in whole or in part, any injury to the Plaintiff?**

Yes __X__ No ______

If your answer is Yes, please proceed to Question 3.

If your answer is No, please skip the remaining questions and have the foreperson sign the last page.

**3. Has the Defendant proven that the Plaintiff was negligent?**

Yes __X__ No ______

If your answer is Yes, please proceed to Question 4.

If your answer is No, please skip Questions 4 and 5, and proceed directly to Question 6.

**4. Has the Defendant proven that the Plaintiff's negligence caused, in whole or in part, any injury to the Plaintiff?**

Yes __X__ No ______

If your answer is Yes, please proceed to Question 5.

If your answer is No, please skip Question 5 and proceed directly to Question 6.

**5. What percentage of Plaintiff's total damages was the result of Defendant's negligence, and what percentage was the result of his own negligence?**

Defendant: __95__%

Plaintiff: __5__%

TOTAL: 100%

Please proceed to Question 6.

**6. What amount of damages do you find the Plaintiff sustained as a result of the injury?**

a. Loss of earnings and benefits from April 20, 2024 to the present:

$ 125,000

b. Loss of earnings and benefits into the future (discounted to present value):

$ 1,055,000

c. Past pain and suffering, including loss of enjoyment of life:

$ 1,000,000

d. Future pain and suffering, including loss of enjoyment of life:

$ 2,100,000

**Do not reduce these amounts by any percentage you may have entered in Question 5. If a reduction is required, the Court will make it.**

Your verdict must be unanimous. The foreperson should sign and date this form and notify the Marshal that you have reached a verdict.

Date: 8-20-2026

[redacted]

FOREPERSON

[redacted]

# COURT EXHIBIT 5

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------X
EDUARDO WILLIAMS,

Plaintiff, 24 Civ. 9536 (DEH)(JW)

-against-

PORT AUTHORITY TRANS HUDSON CORP.,

Defendant.
----------------------------------------------------------X

**VERDICT FORM**

**1. Has the Plaintiff proven that the Defendant was negligent in any manner claimed by Plaintiff?**

Yes _________ No _________

If your answer is Yes, please proceed to Question 2.

If your answer is No, please skip the remaining questions and have the foreperson sign the last page.

**2. Has the Plaintiff proven that the Defendant's negligence caused, in whole or in part, any injury to the Plaintiff?**

Yes _________ No _________

If your answer is Yes, please proceed to Question 3.

If your answer is No, please skip the remaining questions and have the foreperson sign the last page.

**3. Has the Defendant proven that the Plaintiff was negligent?**

Yes _________ No _________

If your answer is Yes, please proceed to Question 4.

If your answer is No, please skip Questions 4 and 5, and proceed directly to Question 6.

**4. Has the Defendant proven that the Plaintiff's negligence caused, in whole or in part, any injury to the Plaintiff?**

Yes _________ No _________

If your answer is Yes, please proceed to Question 5.

If your answer is No, please skip Question 5 and proceed directly to Question 6.

**5. What percentage of Plaintiff's total damages was the result of Defendant's negligence, and what percentage was the result of his own negligence?**

Defendant: _______%

Plaintiff: _______%

TOTAL: 100%

Please proceed to Question 6.

**6. What amount of damages do you find the Plaintiff sustained as a result of the injury?**

a. Loss of earnings and benefits from April 20, 2024 to the present:

$_______________

b. Loss of earnings and benefits into the future (discounted to present value):

$_______________

c. Past pain and suffering, including loss of enjoyment of life:

$_______________

d. Future pain and suffering, including loss of enjoyment of life:

$_______________

**Do not reduce these amounts by any percentage you may have entered in Question 5. If a reduction is required, the Court will make it.**

Your verdict must be unanimous. The foreperson should sign and date this form and notify the Marshal that you have reached a verdict.

Date: _______________ ______________________________

FOREPERSON

***Eduardo Williams v. PATH, Case No. 24 Civ. 9536 (DEH)***

**FINAL JURY INSTRUCTIONS**

Members of the Jury: Now that you have the evidence, it becomes my duty to give you instructions concerning the law applicable to this case. I am going to read my instructions to you.

My instructions to you will be in three parts.

First, I will give you general instructions – for example, about your role as the jury, what you can and cannot consider in your deliberations, and the burden of proof.

Second, I will describe the law that you must apply to the facts as you find them from the evidence in this case. You are not to single out one instruction alone as stating the law, but must consider the instructions as a whole.

Finally, I will give you some instructions for your deliberations.

## I. ROLE OF THE JURY

You, the members of the jury, are the sole and exclusive judges of the facts. Your duty is to decide what the facts are from the evidence. You are allowed to consider the evidence in the light of your own observations and experiences. After you have decided what the facts are, you will have to apply those facts to the law that I give you in these and in my other instructions. Do not let sympathy, or your own likes or dislikes, influence you. You must weigh and consider the evidence without regard to prejudice or passion for or against any party. It is your duty to accept my instructions as to the law, whether you agree with them or not. You have taken an oath to follow the law that I give you in my instructions and to apply them to the facts as you determine them. That is how you will reach your verdict. If either party has stated a legal principle

differently from any that I state to you in my instructions, it is my instructions that you must follow.

In deciding what the facts are, you may have to decide what testimony you believe and what testimony you do not believe. You may believe all of what a witness says, or only part of it, or none of it. In deciding what testimony to believe, you may consider a number of factors, including the following:

(1) The opportunity and ability of the witness to see or hear or know the things the witnesses testifies to;

(2) The quality of the witness's understanding and memory;

(3) The witness's manner while testifying;

(4) Whether the witness has an interest in the outcome of the case or any motive, bias, or prejudice;

(5) Whether the witness is contradicted by anything the witness said or wrote before trial or by other evidence;

(6) How reasonable the witness's testimony is when considered in the light of other evidence you believe; and

(7) Any other factors that bear on believability.

The weight of the evidence does not depend on the number of witnesses who testify. A fact may be proved by the testimony of just one witness if you believe that witness. What matters is not how many people testified about something, but how believable and reliable you find that testimony. The law requires you to come to a just verdict based only on the evidence, your common sense, and the law that I give you in my instructions, nothing else.

### A. The Parties

As you know, the Plaintiff in this case is Eduardo Williams. The Defendant in this case is PATH. In reaching your verdict, you must remember that all parties stand equal before a jury in the courts of the United States. No party is entitled to any greater or lesser consideration by you. The fact that one party is a corporation and the other is an individual must not affect your deliberations. A corporation is entitled to the same fair and impartial consideration as any individual.

### B. Conduct of Counsel

The lawyers are here as advocates for their clients. They have given you their views of the evidence and their arguments in favor of their client's position. While you may consider their comments, nothing that the attorneys say is evidence and their comments are not binding upon you.

### C. Direct and Circumstantial Evidence

There are two types of evidence that you may properly use in reaching your verdict. The first type is direct evidence. Direct evidence of a fact in issue is presented when a witness testifies to that fact based on what he or she personally saw, heard, or otherwise observed through the five senses. The second type of evidence is circumstantial evidence. Circumstantial evidence is evidence that tends to prove a disputed fact indirectly by proof of other facts.

There is a simple example of circumstantial evidence that is often used in this courthouse. Assume that when you came into the courthouse this morning, the sun was shining, and it was a nice day outside. Also assume the courtroom shades were drawn and you could not look outside. Assume further that as you were sitting here, someone walked in with an umbrella that was dripping wet, and then, a few moments later, somebody else walked in with a raincoat that was

also dripping wet.

Now, because you could not look outside the courtroom and you could not see whether it was raining, you would have no direct evidence of that fact. But, on the combination of facts that I have asked you to assume, it would be reasonable and logical for you to conclude that it was raining.

That is all there is to circumstantial evidence. You infer on the basis of your reason, experience, and common sense from one established fact the existence or the nonexistence of some other fact. The matter of drawing inferences from facts in evidence is not a matter of guesswork or speculation. An inference is a logical, factual conclusion that you might reasonably draw from other facts that have been proved. It is for you, and you alone, to decide what inferences you will draw.

Importantly, circumstantial evidence may be given as much weight as direct evidence. The law makes no distinction between direct and circumstantial evidence. It asks only that you consider all the evidence presented.

**D. What is and what is not evidence**

What, then, is the evidence in the case?

The evidence in this case is (1) the sworn testimony of the witnesses, (2) the documents and other things I receive as exhibits, and (3) the parties' stipulations, that is, the facts that I told you the parties have agreed are true, or other facts I tell you to accept as true.

Nothing else is evidence.

Lawyers' statements, arguments, questions, and comments are not evidence. Objections are also not evidence. Lawyers have a right—and sometimes a duty— to object when they believe something should not be part of the trial. Do not be influenced one way or another by

objections to any testimony or evidence. If I sustained a lawyer's objection to a question or an exhibit, that means the law does not allow you to consider that information. When that happens, you have to ignore the question or the exhibit, and you must not try to guess what the information might have been. If I overruled an objection, that means that I have decided it is legally permissible that certain testimony or evidence to be introduced, but that does not mean that I have decided on its importance or significance. That is for you to decide.

In addition, documents or other things that might be in court or talked about, but that I do not receive as exhibits are not evidence. Moreover, testimony or exhibits that have been stricken or excluded by me from the record, or told you to disregard, are not evidence and may not be considered by you in rendering your verdict. Do not speculate about what a witness might have said or what an exhibit might have shown. Also, anything you see or hear about this case outside the courtroom is not evidence and you must not consider it.

Along these lines, you will recall that, among the exhibits received in evidence, some documents had portions blacked out, or "redacted." As I previously told you, when you see redactions in the documents, that means that either the parties have agreed, or the Court has ruled, that you should not see the content that has been redacted. Redactions are not evidence, and in considering a redacted document, you should not speculate as to the content of the redaction nor base any decisions on the weight you give the document on the fact that the document contains a redaction. In considering a redacted document, you should only consider the portion of the document visible to you.

Finally, questions that I may have asked the witnesses are not evidence. You must not make any conclusions based on any of my questions, comments, or rulings that I hold any views for or against either of the parties or any of their witnesses. Nothing I said or did during this trial

is meant to suggest what I think of the evidence or what I think your verdict should be.

**E. Impeachment**

A witness may be discredited, or "impeached," by contradictory evidence, or by deposition testimony or evidence showing that at some other time the witness said or did something, or failed to say or do something, that is inconsistent with the witness's present testimony. If you believe that a witness has been impeached and thus discredited, you may give the testimony of that witness such credibility, if any, you think it deserves.

If a witness is shown to have knowingly testified falsely about anything that is important in proving a claim, you have a right to distrust such witness's other testimony and you may reject all the testimony of that witness or give it such credibility as you may think it deserves. An act or omission is "knowingly" done, if the act is done voluntarily and intentionally, and not because of a mistake or accident or other innocent reason.

**F. Stipulated Facts**

The parties have agreed to certain facts in this case. You must accept these facts as true. The stipulated facts are as follows:

1) This action is brought under the Federal Employers' Liability Act, 45 U.S.C. § 51 et seq.

2) The defendant is a corporation engaged in interstate commerce by rail and operates a railroad system and railroad yards within the jurisdiction of this Court.

3) Prior to April 20, 2024, and at all times hereinafter mentioned, the defendant employed the plaintiff as a Trackman 1 in furtherance of defendant's business in interstate commerce.

4) Prior to April 20, 2024 and at all times hereinafter mentioned, the defendant maintained, operated and controlled Track G7 in Newark, New Jersey, which contained defendant's tracks, rails, switches, sidings, roadbeds and appurtenances thereto, over, through and upon which the defendant operated engines, trains and cars.

5) During all times herein mentioned, the defendant was and is engaged in interstate commerce by providing railroad transportation among multiple states.

6) Plaintiff has been out of work since April 20, 2024.

7) On April 20, 2024, Plaintiff earned $27.49 per hour straight time.

8) On October 13, 2024, plaintiff's job received an increase in pay to $31.64 per hour straight time.

**G. Use of Depositions**

Some of the testimony before you is in the form of depositions which have been received in evidence. A deposition is simply a procedure where the attorneys for one side may question a witness or an adversary party under oath before a court stenographer prior to trial. This is part of the pretrial discovery, and each side is entitled to take depositions. You may consider the testimony of a witness given at a deposition according to the same standards you would use to evaluate the testimony of a witness given at trial.

**H. Preponderance of the Evidence**

The party with the burden of proof on any given issue has the burden of proving every disputed element of that issue by a preponderance of the evidence. If you conclude that the party bearing the burden of proof has failed to establish that issue by a preponderance of the evidence, you must decide against that party on the issue you are considering.

Different parties bear the burden of proof on different issues in this case. The plaintiff has the burden of proving each element of his negligence under the FELA. The defendant has the burden of proving each of the defenses it has raised, including its contentions that the plaintiff was himself negligent and that the plaintiff failed to mitigate his damages. The burden of proof on an issue never shifts: it remains throughout the trial on the party who must prove that issue.

What does a "preponderance of the evidence" mean? To establish a fact by a preponderance of the evidence means to prove that the fact is more likely true than not true. A preponderance of the evidence means the greater weight of the evidence. It refers to the quality and persuasiveness of the evidence, not to the number of witnesses or documents. In determining whether an issue has been proved by a preponderance of the evidence, you may consider the relevant testimony of all witnesses, regardless of who may have called them, and all the relevant exhibits received in evidence, regardless of who may have produced them.

If you find that the credible evidence on a given issue is evenly divided between the parties — that it is equally probable that one side is right as it is that the other side is right — then you must decide that issue against the party having the burden of proof. On the other hand, the party with the burden of proof need prove no more than a preponderance. So long as you find that the scales tip, however slightly, in favor of the party with the burden of proof — that what that party claims is more likely true than not true — then the issue will have been proved by a preponderance of the evidence.

Some of you may have heard of proof beyond a reasonable doubt, which is the proper standard of proof in a criminal trial. That requirement does not apply to a civil case such as this and you should put it out of your mind.

### I. Expert Testimony

You have heard testimony from Dr. Joseph Galloway and Mr. Jeffrey Opp, who testified as expert witnesses. The rules of evidence allow witnesses with specialized knowledge, training, education, or experience to give their opinions on matters within their area of expertise. You may consider this expert testimony, together with all the other evidence in this case, and give it the weight you think it deserves. In doing so, you may consider the expert's qualifications, the reasons given for the expert's opinion, and the other evidence in the case.

## II. SUBSTANTIVE ISSUES

That completes my introductory instructions. Let me now turn to the law that applies to the issues in this case.

### A. FELA

- The plaintiff, EDUARDO WILLIAMS, brings this action against the defendant PORT AUTHORITY TRANS HUDSON CORP. under the Federal Employers' Liability Act or FELA.
- That act provides in substance that every railroad engaged in interstate commerce shall be liable in damages for injuries to its employees resulting in whole or in part from the negligence of any of its officers, agents or employees or from any defect or deficiency, due to its negligence, in its cars, machinery, track, roadbed or work areas.
- Thus, the Federal Employers' Liability Act imposed on defendant a duty to plaintiff, and to all its employees, to exercise reasonable care to provide him with a reasonably safe place in which to work, reasonably safe conditions in which to work and reasonably safe tools and equipment.

- In order to find defendant liable to plaintiff, under the FELA statute, you must find by a preponderance of the evidence:
  - First, that defendant is a railroad engaged in interstate commerce;
  - Second, that plaintiff was an employee of the defendant in interstate commerce, acting in the course of his employment;
  - Third, that defendant or one of its employees or agents was negligent; and
  - Fourth, that such negligence played a part, no matter how slight, in bringing about an injury to plaintiff.
- Only then should you reach the question of damages, which I will discuss later
- In this case, the parties agree that the first two elements exist. Therefore, you must consider them proven already. You need only concern yourself with the third and fourth elements.

### B. Corporate Agents

- As a general rule, whatever any person is legally capable of doing himself can be done through another as agent. So, if the acts of an employee or other agent are voluntarily and intentionally ordered or directed, or authorized or consented to by a person, then the law holds that person responsible for such acts, the same as if the acts had in fact been done by such person.
- A corporation is in law a person, but of course it cannot act otherwise than through its directors, or officers, or employees, or other agents. The law therefore holds a corporation responsible for all unlawful acts of its directors, or officers, or employees, or other agents, provided such unlawful acts are done within the scope of their authority, as

would usually be the case if done in the ordinary course of their employment, or in the ordinary course of the corporation's business.

- Authority to act for a corporation in a particular matter, or in a particular way or manner, may be inferred from the surrounding facts and circumstances shown by the evidence in the case. That is to say, authority to act for a corporation, like any other fact in issue in a civil case, need not be established by direct evidence, but may be established by indirect or circumstantial evidence.
- Every act of every director, or officer, or employee, or other agent, on behalf of, or in the name of a corporation, if done within the scope of his authority, is in law the act of the corporation itself.

**C. Negligence**

- The third element is whether defendant or its employees or agents were negligent.
  - The fact that plaintiff was injured during his employment does not automatically entitle him to recover from his employer. Plaintiff can only recover from Defendant if negligence and the other elements I will describe are established by a preponderance of the evidence.

**1. Generally**

- Negligence is simply the failure to use the same degree of care which a person of ordinary prudence would use in the circumstances of a given situation. It can be the doing of something which a reasonably prudent person would not have done or failing to do something which a reasonably prudent person would have done under the circumstances.

- This definition of negligence requires defendant to guard against those risks or dangers of which it knew or by the exercise of due care should have known. In other words, defendant's duty is measured by what a reasonably prudent person would anticipate or foresee resulting from particular circumstances.
- If you find by a preponderance of the evidence that a reasonably prudent person would have taken reasonable precautions against the risk based on such actual knowledge, statements, complaints or protests or reasonable inspection, and you find that defendant failed to take such reasonable precautions, then you may find that defendant was negligent.
- How do you determine whether defendant knew or, through the exercise of reasonable care, should have known of a particular risk or danger?
    - First, you may consider any evidence presented concerning the actual knowledge of the railroad or its foreman or other agents.
    - Second, you may consider any evidence presented concerning whether the risk was brought to the attention of the railroad or its foreman or other agents, for example, through employees' statements, complaints or protests that a particular condition or assignment was dangerous.
    - Third, you may consider whether a reasonably prudent person would have performed inspections which would have brought the dangerous condition to defendant's attention or otherwise would have known of the condition.
- The degree of care required by the reasonable care standard varies with the level of risk. The greater the risk of harm, the greater the required level of care.

**August 20, 2026**

- You may also find defendant negligent if you find that it instructed its employees to perform tasks either with a number of employees or a procedure or method which it knew or in the exercise of reasonable care should have known, would result in injury.
- In addressing the question of negligence, you may consider the evidence that was presented concerning the custom in the industry or safety rules. If you find that there were such customs or rules, they may indicate recognition of a hazard and the means to avoid it, which you may consider as one indication of what may be reasonable in a given situation. On the other hand, you may find that an industry custom or a safety rule does not reflect the level of care that a reasonably prudent person would take and that, although an industry custom or safety rule was followed, the party in question was negligent. Similarly, even if you find that a party violated or failed to enforce a safety rule, or did not take customary precautions, such a failure does not mandate a finding of negligence. Before you may impose liability, you must still find that the party in question failed to exercise reasonable care in the circumstances.
- If you find by a preponderance of the evidence that defendant failed to exercise reasonable care to provide plaintiff with a reasonably safe place to work, reasonably safe conditions, tools or equipment, or failed in any other way to exercise reasonable care in the circumstances, you may find that defendant was negligent.

**2. Res Ipsa Loquitor**

- Concerning negligence, I have already told you that the mere occurrence of an accident does not automatically entitle plaintiff to recover. However, under certain circumstances, you may, but are not required to, infer negligence from the unexplained happening of an

event which in the ordinary course of things would not occur in the absence of negligence.

- Before you may make such an inference, you must find by a preponderance of the evidence:
  - First, that the thing which caused the injury was in the exclusive control of defendant;
  - Second, that the injury was one which in the ordinary course of things does not occur if the one having exclusive control uses proper care; and
  - Third, that the injury was not due to any negligence on the part of plaintiff.
- If you find that these three conditions are met, you may, but are not required to, infer that the defendant was negligent; or you may consider the inference as evidence of negligence which the defendant is entitled to, but not required to, rebut or explain.
- I repeat that whether you make the inference as I have just described is for you to decide. If you find the factors I have specified are present, you may, but are not required to draw an inference of negligence.

**D. Causation**

- The fourth element is whether an injury to the plaintiff resulted in whole or part from the negligence of the railroad or its employees or agents. In other words, did such negligence play any part, even the slightest, in bringing about an injury to the plaintiff?
- You reach this element only if you have found by a preponderance of the evidence that the defendant railroad or its employees or agents were negligent.
- However, it is important to remember that there can be more than one cause of an injury. The involvement of any other cause does not prevent a finding for the plaintiff, as long as

you find that the employer's negligence played any part, no matter how slight, in causing an injury to the plaintiff

**1. Contributory Negligence**

- In this case, defendant has contended that plaintiff's injuries were due, at least in part, to plaintiff's own negligence. This is referred to as "contributory negligence."
- To determine whether the plaintiff was "contributorily negligent," you apply the same definition of negligence discussed earlier, that is, did plaintiff take, or fail to take, actions which a reasonably prudent person would have taken under the same circumstances. You also apply the same rule of causation, that is, did plaintiff's negligence, if any, play any part in bringing about his injuries.
- Now, assuming that you find by a preponderance of the evidence that defendant was negligent and that its negligence played a part in causing plaintiff's injuries; and assuming that you find that plaintiff was negligent and that his negligence played a part in causing his own injuries, you must then determine the percentage to which plaintiff's negligence, if any, contributed to his injuries. You will report this percentage on the special verdict form which I will discuss shortly, and then after you return your verdict, I will decrease the amount of damages you have found, if any, by the percentage by which you find his negligence contributed to his own injuries.
- In deciding whether Mr. Williams was contributorily negligent, there are two things you may not do. First, the fact that Mr. Williams's job was dangerous, or that his injury resulted from a usual risk of that job, does not prevent him from recovering and does not reduce his damages. Second, contributory negligence may arise only from Mr. Williams's own act or acts of negligence. It may not arise from his knowingly taking on a risk

inherent in the work environment, or a risk created by the defendant's negligence. You should first decide whether the defendant was negligent, under the standards I have already explained to you. Only then should you consider whether Mr. Williams was himself negligent.

- The defendant is not responsible if the plaintiff's negligence was solely responsible for his injury. Thus, if you find that the plaintiff was negligent, and that the plaintiff's negligence was the sole cause of his injury, then you must return your verdict in favor of defendant.
- As I will remind you when I discuss damages in detail, if you reach the issue of damages, you should address the question of damages as a separate matter from the issue of contributory negligence.
- In my preliminary instructions, I told you that the Plaintiff claimed the Defendant violated a federal railroad safety regulation, and that if you found such a violation contributed to the plaintiff's injuries, the plaintiff's damages would not be reduced by any negligence of his own. I have now determined, as a matter of law, that the federal regulation does not apply in this case. You will not be asked to decide whether any federal regulation was violated, and the rule about reduction of damages that I described does not apply. You will decide the plaintiff's claim, and the defendant's contention that the plaintiff was himself negligent, under the instructions on negligence I gave you. This ruling concerns only the federal regulation. It does not remove any evidence from your consideration. All of the evidence you have heard remains in this case for you to consider.

**E. Damages**

I will now give you instructions on damages.

The purpose of the FELA is to compensate an injured party for the damages sustained as a result of another's negligent conduct.

Your award must be fair and just.

It should neither be excessive nor inadequate; it should be reasonable.

If you find that Mr. Williams has proved his claim against PATH by a preponderance of the evidence, you must determine the damages to which Mr. Williams is entitled. You should not interpret the fact that I am giving you instructions about damages as an indication in any way that I believe Mr. Williams should, or should not, win this case. Your first task is to decide whether PATH was negligent and whether PATH's negligence led to Mr. Williams injuries. I am instructing you on damages only so that you will have guidance if you decide that PATH is liable and that Mr. Williams is entitled to recover money from PATH.

If you find that Mr. Williams is entitled to recover damages, he must prove the amount of those damages by a preponderance of the evidence. Damages must be based on evidence and not speculation. However, damages do not need to be proved with mathematical precision. You may make reasonable estimates based on the evidence presented. Mr. Williams is only required to present such evidence as might reasonably be expected to be available under the circumstances to prove the loss that is claimed. You may only award damages for losses that you find were caused by the Defendant's conduct and that have been proven by a preponderance of the evidence.

Under the FELA, Mr. Williams, if he has sustained his burden of proof, may recover for:

1. Economic damages, including the loss of earnings from the time of the accident to the present, and in the future;

2. Compensatory damages, including pain, suffering and mental anguish, including the effect of his injury on the normal pursuits and pleasures of life, experienced from the date of the accident to the present; and as you may reasonably find he is likely to endure in the future as a result of his injury.

I will discuss each of these categories in turn.

### 1. Economic Damages

If you find PATH liable for negligence, you may award as damages an amount that reasonably compensates Mr. Williams for any lost wages and benefits, taking into consideration any increases in salary and benefits, that Mr. Williams would have received had he not been disabled and continued working at PATH. This is known as past lost earnings.

In addition to past lost earnings, you may also award future lost earnings. In considering future lost earnings, it is assumed that if the injured party had not been disabled, he would have continued to work and to receive wages for some period of time. The purpose of this element of damages is to compensate the worker for the loss of that income. To determine the award for this element, if any, you must determine how many additional years plaintiff would have worked, as well as what his annual compensation would have been during each future year.

Regarding the number of years which plaintiff would have worked, life expectancy and work-life expectancy numbers have been discussed on the record. It is for you to determine, based on all of this evidence, how many additional years plaintiff would have worked.

Future lost earnings is an award for lost compensation during the period between the date of your verdict and the date when Mr. Williams would have voluntarily resigned, retired, or

obtained other employment.

Regarding the annual compensation which plaintiff would have received in each future year, you must address several items, based on the evidence presented at this trial:

First, you must determine the amount of wages that would have been received in each year. Since the award, if any, is not subject to taxes, this amount should be an after-tax amount.

If you make any award of damages, such award is not subject to federal income taxes and you should not consider such taxes in determining the amount of damages, if any

In determining the amount of such wages, you may start with the worker's annual wage at the time of injury. You then may consider the evidence presented and determine the extent to which plaintiff would have received raises due to years of service, merit, promotions, or general increases in the wages of workers. (You may not consider raises which might have resulted from price inflation during those years, either through cost-of-living increases or otherwise.)

Second, you may also consider fringe benefits, including insurance coverage, pension and retirement plans as compensation in each year. You heard evidence that the plaintiff received certain benefits after his injury. That evidence was admitted for one limited purpose only: you may consider it, if you find it helpful, in evaluating the plaintiff's credibility. You may not consider it for any other purpose. In particular, this evidence has nothing to do with the amount of any damages, and you must not add or subtract from any award because of it.

You should calculate an amount of compensation for each future year, or any part thereof, during which the plaintiff would have worked had he not been disabled, as claimed.

For both potential past and future lost earnings, you may only award damages that Mr. Williams has proven, by a preponderance of the evidence, it is reasonably certain he would have

earned if he had continued to work for PATH.

**2. Discounting Damages**

Economic damages for lost future wages and benefits are also subject to what is called discounting to present cash value. Present cash value is the amount of money that, if reasonably invested today, will provide Mr. Williams with the amount of his future damages. The reason you must do this is because money received now will, through investment, grow to a larger amount in the future. This instruction does not apply to non-economic damages such as pain and suffering, which are not reduced to present cash value, and which I will discuss later.

In discounting the amount of lost future wages, if any, to present value, you should use one of the two methods which I am about to describe to determine what discount rate to apply. Those two methods are called the "total offset method" and the "real interest rate" method.

First, you must determine, based on the evidence at this trial, which method of discounting best reflects the pattern in plaintiff's line or work. I will review how each of these methods works:

In the "total offset method," it is assumed that, while it is true that a given sum of money in hand today will earn interest, it is also assumed that general inflation and other factors will completely offset that interest. Since I have already instructed you not to include wage increases due to general inflation in your computation of the amount of lost future wages, under this approach, you would not apply a discount rate.

In the “real interest rate” approach, it is assumed that the interest rate which could be earned on a given sum of money is partially offset by increases in wages due to general inflation, with the remaining interest rate representing the “real” rate of interest. Since I have already instructed you not to include wage increases due to general inflation, under this approach, you

would apply a discount rate equal to the "real interest rate." I charge you that, if you use this method, a discount rate between one and three percent would be reasonable.

Once you have determined the appropriate discount rate, if any, you should apply it to the lost annual income for each year separately. The sum of all the annual figures, after discounting, equals the award for lost wages.

### 3. Mitigation

You are instructed that any person who claims damages as a result of an alleged wrongful act of another has a duty under the law to use reasonable diligence under the circumstances to "mitigate," or minimize, those damages. The law imposes on an injured person the duty to take advantage of reasonable opportunities he may have to prevent the aggravation of his injuries, so as to reduce or minimize the loss or damage. If you find the defendant is liable and that the plaintiff has suffered damages, the plaintiff may not recover for any item of damage he could have avoided through such reasonable effort. If the plaintiff unreasonably failed to take advantage of an opportunity to lessen his damages, you should deny recovery for those damages which he would have avoided had he taken advantage of the opportunity. Bear in mind that the question whether the plaintiff acted "reasonably" with respect to the mitigation of damages is one for you to decide, as sole judges of the facts. Although the law will not allow an injured plaintiff to sit idly by when presented with an opportunity to mitigate, this does not imply that the law requires an injured plaintiff to exert himself unreasonably or incur unreasonable expense in an effort to mitigate, and it is defendant's burden of proving that the damages reasonably could have been avoided. In deciding whether to reduce plaintiff's damages due to some failure to mitigate, therefore, you must weigh all the evidence in light of the particular circumstances of

the case, using sound discretion in deciding whether the defendant has satisfied his burden of proving that the plaintiff's conduct was not reasonable.

**4. Other Benefits**

The question of any other benefits or payments Mr. Williams may have received is not before you. You should not speculate about it and you should not consider it in your deliberations.

**5. Compensatory Damages**

In addition to past and future lost earnings, if you find for Mr. Williams on the issue of liability, then you may award him compensatory damages. That is, you may award a sum of money that you believe will fairly and justly compensate him for any injuries you believe he has proved, by a preponderance of the evidence, were caused by PATH's negligence. Your award must be based on evidence and not speculation or guesswork. This does not mean, however, that compensatory damages are restricted to the actual loss of money; they can also include any physical or mental aspects of injury, even if they are not easy to measure.

In calculating compensatory damages, you may consider any pain, suffering, and mental anguish that Mr. Williams may have experienced and is reasonably certain to experience in the future, including the effect of the injury on the normal pursuits and pleasures of his life. No evidence of the dollar value of pain, suffering, and mental anguish needs to be introduced. There is no exact standard for setting the damages to be awarded on account of pain and suffering. You are to determine an amount that will fairly compensate Mr. Williams for the injury he has sustained as a direct result of PATH's negligence, if any. You may not award compensatory damages for pain, suffering, and mental anguish that is the result of circumstances other than PATH's negligence.

Mr. Williams is not required to introduce medical, psychological, or other expert testimony to prove emotional distress damages. He may prove emotional distress through his own testimony alone, and you may rely on that testimony if you find it credible.

As I mentioned earlier, my instruction about reducing economic damages to their present cash value does not apply to non-economic damages such as pain and suffering. These damages are not reduced to present cash value.

If you find that any of plaintiff's injuries are permanent, you must make such allowance in your verdict as you think circumstances warrant, taking into consideration the period of time that has elapsed from the date of the injury to the present time, and the period of time plaintiff can be expected to live.

You have heard evidence concerning life expectancy and work-life expectancy. Such tables and figures are statistical averages. They are not binding on you, and you may consider them together with your own experience and the evidence you have heard concerning the plaintiff's health, habits, employment and activities.

## III. Concluding Instructions

### A. Selection of Foreperson

In a few minutes, you are going to go into the jury room and begin your deliberations. Your first task will be to select a foreperson. The foreperson has no greater voice or authority than any other juror, but is the person who will communicate with me when questions arise and when you have reached a verdict. The foreperson is also who will be asked in open court to pass your completed Verdict Form to me.

**B. Sending Notes**

You may have questions or comments for me as you deliberate. If you do, you can communicate with me by sending notes using forms and envelopes that you will be provided for that purpose. Your notes to me should be signed by the foreperson and should include the date and time they were sent. They should also be as clear and as precise as possible, as they will become part of the record in this case. Do not tell me or anyone else how you stand on any issue until after a unanimous verdict is reached.

**C. Right to See Exhibits and Hear Testimony**

All of the exhibits will be given to you near the start of deliberations on a laptop. In addition, you will also be provided with a list of all the exhibits that were received into evidence.

If you prefer to view any evidence here in the courtroom or if you want any of the testimony submitted to you or read back to you, you may also request that. Keep in mind that if you ask for testimony, however, the court reporter must search through his or her notes, the parties must agree on what portions of testimony may be called for, and if they disagree I must resolve those disagreements. That can be a time-consuming process. So please try to be as specific as you possibly can in requesting portions of the testimony, if you do.

Again, your requests for testimony - in fact, any communication with the Court – should be made to me in writing, signed by your foreperson with the date and time, and given to one of the Court Security Officers.

**D. Juror Note-Taking**

If any one of you took notes during the course of the trial, you should not show your notes to, or discuss your notes with, any other jurors during your deliberations. Any notes you have taken are to be used solely to assist you. The fact that a particular juror has taken notes

entitles that juror's view to no greater weight than those of any other juror. Finally, your notes are not to substitute for your recollection of the evidence in the case. If, during your deliberations, you have any doubt as to any of the testimony, you may—as I just told you—request that the official trial transcript that has been made of these proceedings be submitted or read back to you.

### E. Duty to Deliberate

The most important part of this case is the part that you as jurors are now about to play as you deliberate on the issues of fact. I know you will try the issues that have been presented to you according to the oath that you have taken as jurors. In that oath, you promised that you would well and truly try the issues joined in this case and render a true verdict.

As you deliberate, please listen to the opinions of your fellow jurors, and ask for an opportunity to express your own views. Every juror should be heard. No one juror should hold the center stage in the jury room, and no one juror should control or monopolize the deliberations. If, after listening to your fellow jurors and if, after stating your own view, you become convinced that your view is wrong, do not hesitate because of stubbornness or pride to change your view. On the other hand, do not surrender your honest convictions and beliefs solely because of the opinions of your fellow jurors or because you are outnumbered.

Your verdict must be unanimous. If at any time you are not in agreement, you are instructed that you are not to reveal the standing of the jurors—that is, the split of the note—to anyone, including me, at any time during your deliberations.

### F. Return of the Verdict

We have prepared a Verdict Form for you to use in recording your decisions, a copy of which is attached to these instructions. Do not write on your individual copies of the Verdict

Form. My staff will give the official Verdict Form to Juror Number One, who should give it to the foreperson after the foreperson has been selected.

As you will see, the Verdict Form is kind of like those old "choose your own adventure" books. Depending on your answer to a question or questions, you will be directed to either answer another question or to sign the Verdict Form. You should draw no inference from the questions on the Verdict Form as to what your verdict should be. The questions are not to be taken as any indication that I have any opinion as to how they should be answered.

When you have completed the Verdict Form, please review your answers to ensure that they accurately reflect your unanimous determinations. If they do, the foreperson should note the date and time and you should all sign the Verdict Form. The foreperson should then give a note—not the Verdict Form itself—to the Court Security Officer outside your door, stating that you have reached a verdict. Do not specify what the verdict is in your note. Instead, the foreperson should retain the Verdict Form and hand it to me in open court when I ask for it.

I will stress again that all of you must be in agreement with the verdict that is announced in court. Once your verdict is announced in open court and officially recorded, it cannot ordinarily be revoked.

### G. Closing Comments

Thank you again for your service and for the care and attention you have given this case, and for your thoughtfulness in the deliberations ahead of you.